*561 Justice Kennedy
delivered the opinion of the Court.
In the fire department of New Haven, Connecticut — as in emergency-service agencies throughout the Nation — fire *562 fighters prize their promotion to and within the officer ranks. An agency’s officers command respect within the department and in the whole community; and, of course, added responsibilities command increased salary and benefits. Aware of the intense competition for promotions, New Haven, like many cities, relies on objective examinations to identify the best qualified candidates.
In 2003, 118 New Haven firefighters took examinations to qualify for promotion to the rank of lieutenant or captain. Promotion examinations in New Haven (or City) were infrequent, so the stakes were high. The results would determine which firefighters would be considered for promotions during the next two years, and the order in which they would be considered. Many firefighters studied for months, at considerable personal and financial cost.
When the examination results showed that white candidates had outperformed minority candidates, the mayor and other local politicians opened a public debate that turned rancorous. Some firefighters argued the tests should be discarded because the results showed the tests to be discriminatory. They threatened a discrimination lawsuit if the City made promotions based on the tests. Other firefighters said the exams were neutral and fair. And they, in' turn, threatened a discrimination lawsuit if the City, relying on the statistical racial disparity, ignored the test results and denied promotions to the candidates who had performed well. In the end the City took the side of those who protested the test results. It threw out the examinations.
Certain white and Hispanic firefighters who likely would have been promoted based on their good test performance *563 sued the City and some of its officials. Theirs is the suit now before us. The suit alleges that, by discarding the test results, the City and the named officials discriminated against the plaintiffs based on their race, in violation of both Title VII of the Civil Rights Act of 1964, 78 Stat. 258, as amended, 42 U. S. C. § 2000e et seq., and the Equal Protection Clause of the Fourteenth Amendment. The City and the officials defended their actions, arguing that if they had certified the results, they could have faced liability under Title VII for adopting a practice that had a disparate impact on the minority firefighters. The District Court granted summary judgment for the defendants, and the Court of Appeals affirmed.
We conclude that race-based action like the City’s in this case is impermissible under Title VII unless the employer can demonstrate a strong basis in evidence that, had it not taken the action, it would have been liable under the disparate-impact statute. Respondents, we further determine, cannot meet that threshold standard. As a result, the City’s action in discarding the tests was a violation of Title VII. In light of our ruling under the statutes, we need not reach the question whether respondents’ actions may have violated the Equal Protection Clause.
I
This litigation comes to us after the parties’ cross-motions for summary judgment, so we set out the facts in some detail. As the District Court noted, although “the parties strenuously dispute the relevance and legal import of, and inferences to be drawn from, many aspects of this case, the underlying facts are largely undisputed.” 554 F. Supp. 2d 142, 145 (Conn. 2006).
A
When the City of New Haven undertook to fill vacant lieutenant and captain positions in its fire department (Department), the promotion and hiring process was governed by the City charter, in addition to federal and state law. The *564 charter establishes a merit system. That system requires the City to fill vacancies in the classified civil-service ranks with the most qualified individuals, as determined by job-related examinations. After each examination, the New Haven Civil Service Board (CSB) certifies a ranked list of applicants who passed the test. Under the charter’s “rule of three," the relevant hiring authority must fill each vacancy by choosing one candidate from the top three scorers on the list. Certified promotional lists remain valid for two years.
The City’s contract with the New Haven firefighters’ union specifies additional requirements for the promotion process. Under the contract, applicants for lieutenant and captain positions were to be screened using written and oral examinations, with the written exam accounting for 60 percent and the oral exam 40 percent of an applicant’s total score. To sit for the examinations, candidates for lieutenant needed 30 months’ experience in the Department, a high school diploma, and certain vocational training courses. Candidates for captain needed one year’s service as a lieutenant in the Department, a high school diploma, and certain vocational training courses.
After reviewing bids from various consultants, the City hired Industrial/Organizational Solutions, Inc. (IOS), to develop and administer the examinations, at a cost to the City of $100,000. IOS is an Illinois company that specializes in designing entry-level and promotional examinations for fire and police departments. In order to fit the examinations to the New Haven Department, IOS began the test-design process by performing job analyses to identify the tasks, knowledge, skills, and abilities that are essential for the lieutenant and captain positions. IOS representatives interviewed incumbent captains and lieutenants and their supervisors. They rode with and observed other on-duty officers. Using information from those interviews and ride-alongs, IOS wrote job-analysis questionnaires and administered them to most of the incumbent battalion chiefs, captains, and *565 lieutenants in the Department. At every stage of the job analyses, IOS, by deliberate choice, oversampled minority firefighters to ensure that the results — which IOS would use to develop the examinations — would not unintentionally favor white candidates.
With the job-analysis information in hand, IOS developed the written examinations to measure the candidates’ job-related knowledge. For each test, IOS compiled a list of training manuals, Department procedures, and other materials to use as sources for the test questions. IOS presented the proposed sources to the New Haven fire chief and assistant fire chief for their approval. Then, using the approved sources, IOS drafted a multiple-choice test for each position. Each test had 100 questions, as required by CSB rules, and was written below a 10th-grade reading level. After IOS prepared the tests, the City opened a 3-month study period. It gave candidates a list that identified the source material for the questions, including the specific chapters from which the questions were taken.
IOS developed the oral examinations as well. These concentrated on job skills and abilities. Using the job-analysis information, IOS wrote hypothetical situations to test incident-command skills, firefighting tactics, interpersonal skills, leadership, and management ability, among other things. Candidates would be presented with these hypothetical and asked to respond before a panel of three assessors.
IOS assembled a pool of 30 assessors who were superior in rank to the positions being tested. At the City’s insistence (because of controversy surrounding previous examinations), all the assessors came from outside Connecticut. IOS submitted the assessors’ resumes to City officials for approval. They were battalion chiefs, assistant chiefs, and chiefs from departments of similar sizes to New Haven’s throughout the country. Sixty-six percent of the panelists were minorities, and each of the nine three-member assessment panels con *566 tained two minority members. IOS trained the panelists for several hours on the day before it administered the examinations, teaching them how to score the candidates’ responses consistently using checklists of desired criteria.
Candidates took the examinations in November and December 2003. Seventy-seven candidates completed the lieutenant examination — 43 whites, 19 blacks, and 15 Hispanics. Of those, 34 candidates passed — 25 whites, 6 blacks, and 3 Hispanics. 554 F. Supp. 2d, at 145. Eight lieutenant positions were vacant at the time of the examination. As the rule of three operated, this meant that the top 10 candidates were eligible for an immediate promotion to lieutenant. All 10 were white. Ibid. Subsequent vacancies would have allowed at least 3 black candidates to be considered for promotion to lieutenant.
Forty-one candidates completed the captain examination— 25 whites, 8 blacks, and 8 Hispanics. Of those, 22 candidates passed — 16 whites, 3 blacks, and 3 Hispanics. Ibid. Seven captain positions were vacant at the time of the examination. Under the rule of three, 9 candidates were eligible for an immediate promotion to captain — 7 whites and 2 Hispanics. Ibid.
The City’s contract with IOS contemplated that, after the examinations, IOS would prepare a technical report that described the examination processes and methodologies and analyzed the results. But in January 2004, rather than requesting the technical report, City officials, including the City’s counsel, Thomas Ude, convened a meeting with IOS Vice President Chad Legel. (Legel was the leader of the IOS team that developed and administered the tests.) Based on the test results, the City officials expressed concern that the tests had discriminated against minority candidates. Legel defended the examinations’ validity, stating that any numerical disparity between white and minority candidates was likely due to various external factors and was *567 in line with results of the Department’s previous promotional examinations.
Several days after the meeting, Ude sent a letter to the CSB purporting to outline its duties with respect to the examination results. Ude stated that under federal law, “a statistical demonstration of disparate impact,” standing alone, “constitutes a sufficiently serious claim of racial discrimination to serve as a predicate for employer-initiated, voluntar[y] remedies — even . . . race-conscious remedies.” App. to Pet. for Cert. in No. 07-1428, p. 443a; see also 554 F. Supp. 2d, at 145 (issue of disparate impact “appears to have been raised by . . . Ude”).
1
The CSB first met to consider certifying the results on January 22, 2004. Tina Burgett, director of the City’s Department of Human Resources, opened the meeting by telling the CSB that “there is a significant disparate impact on these two exams.” App. to Pet. for Cert. in No. 07-1428, at 466a. She distributed lists showing the candidates’ races and scores (written, oral, and composite) but not their names. Ude also described the test results as reflecting “a very significant disparate impact,” id., at 477a, and he outlined possible grounds for the CSB’s refusing to certify the results.
Although they did not know whether they had passed or failed, some firefighter-candidates spoke at the first CSB meeting in favor of certifying the test results. Michael Blatchley stated that “[e]very one” of the questions on the written examination “came from the [study] material.... [I]f you read the materials and you studied the material, you would have done well on the test.” App. in No. 06-4996-cv (CA2), pp. A772-A773 (hereinafter CA2 App.). Frank Ricci stated that the test questions were based on the Department’s own rules and procedures and on “nationally recognized” materials that represented the “accepted standard[s]” for firefighting. Id., at A785-A786. Ricci stated that he *568 had “several learning disabilities,” including dyslexia; that he had spent more than $1,000 to purchase the materials and pay his neighbor to read them on tape so he could “give it [his] best shot”; and that he had studied “8 to 13 hours a day to prepare” for the test. Id., at A786, A789. “I don’t even know if I made it,” Ricci told the CSB, “[b]ut the people who passed should be promoted. When your life’s on the line, second best may not be good enough.” Id., at A787-A788.
Other firefighters spoke against certifying the test results. They described the test questions as outdated or not relevant to firefighting practices in New Haven. Gary Tinney stated that source materials “came out of New York. . . . Their makeup of their city and everything is totally different than ours.” Id., at A774-A775; see also id., at A779, A780-A781. And they criticized the test materials, a full set of which cost about $500, for being too expensive and too long.
2
At a second CSB meeting, on February 5, the president of the New Haven firefighters’ union asked the CSB to perform a validation study to determine whether the tests were job related. Petitioners’ counsel in this action argued that the CSB should certify the results. A representative of the International Association of Black Professional Firefighters, Donald Day from neighboring Bridgeport, Connecticut, “beseech[ed]” the CSB “to throw away that test,” which he described as “inherently unfair” because of the racial distribution of the results. Id., at A830-A831. Another Bridgeport-based representative of the association, Ronald Mackey, stated that a validation study was necessary. He suggested that the City could “adjust” the test results to “meet the criteria of having a certain amount of minorities get elevated to the rank of Lieutenant and Captain.” Id., at A838. At the end of this meeting, the CSB members agreed to ask IOS to send a representative to explain how it had developed and administered the examinations. They also *569 discussed asking a panel of experts to review the examinations and advise the CSB whether to certify the results.
3
At a third meeting, on February 11, Legel addressed the CSB on behalf of IOS. Legel stated that IOS had previously prepared entry-level firefighter examinations for the City but not a promotional examination. He explained that IOS had developed examinations for departments in communities with demographics similar to New Haven’s, including Orange County, Florida; Lansing, Michigan; and San Jose, California.
Legel explained the exam-development process to the CSB. He began by describing the job analyses IOS performed of the captain and lieutenant positions — the interviews, ride-alongs, and questionnaires IOS designed to “generate a list of tasks, knowledge, skills and abilities that are considered essential to performance” of the jobs. Id., at A931-A932. He outlined how IOS prepared the written and oral examinations, based on the job-analysis results, to test most heavily those qualities that the results indicated were “eritica[l]” or “essential[l].” Id., at A931. And he noted that IOS took the material for each test question directly from the approved source materials. Legel told the CSB that third-party reviewers had scrutinized the examinations to ensure that the written test was drawn from the source material and that the oral test accurately tested real-world situations that captains and lieutenants would face. Legel confirmed that IOS had selected oral-examination panelists so that each three-member assessment panel included one white, one black, and one Hispanic member.
Near the end of his remarks, Legel “implor[ed] anyone that had... concerns to review the content of the exam. In my professional opinion, it’s facially neutral. There’s nothing in those examinations ... that should cause somebody to think that one group would perform differently than another group.” Id., at A961.
*570 4
At the next meeting, on March 11, the CSB heard from three witnesses it had selected to “tell us a little bit about their views of the testing, the process, [and] the methodology.” Id., at A1020. The first, Christopher Hornick, spoke to the CSB by telephone. Hornick is an industrial/organizational psychologist from Texas who operates a consulting business that “direct[ly]” competes with IOS. Id., at A1029. Hornick, who had not “studied] the test at length or in detail” and had not “seen the job analysis data,” told the CSB that the scores indicated a “relatively high adverse impact.” Id., at A1028, A1030, A1043. He stated that “[n]ormally, whites outperform ethnic minorities on the majority of standardized testing procedures,” but that he was “a little surprised” by the disparity in the candidates’ scores— although “[s]ome of it is fairly typical of what we’ve seen in other areas of the countrfy] and other tests.” Id., at A1028-A1029. Hornick stated that the “adverse impact on the written exam was somewhat higher but generally in the range that we’ve seen professionally.” Id., at A1030-A1031.
When asked to explain the New Haven test results, Hornick opined in the telephone conversation that the collective-bargaining agreement’s requirement of using written and oral examinations with a 60/40 composite score might account for the statistical disparity. He also stated that “[b]y not having anyone from within the [D]epartment review” the tests before they were administered — a limitation the City had imposed to protect the security of the exam questions — “you inevitably get things in there” that are based on the source materials but are not relevant to New Haven. Id., at A1034-A1035. Hornick suggested that testing candidates at an “assessment center” rather than using written and oral examinations “might serve [the City’s] needs better.” Id., at A1039-A1040. Hornick stated that assessment centers, where candidates face real-world situations and respond just as they would in the field, allow candi *571 dates “to demonstrate how they would address a particular problem as opposed to just verbally saying it or identifying the correct option on a written test.” Ibid.
Hornick made clear that he was “not suggesting that [IOS] somehow created a test that had adverse impacts that it should not have had.” Id., at A1038. He described the IOS examinations as “reasonably good test[s].” Id., at A1041. He stated that the CSB’s best option might be to “certify the list as it exists” and work to change the process for future tests, including by “[r]ewriting the Civil Service Rules.” Ibid. Hornick concluded his telephonic remarks by telling the CSB that “for the future,” his company “certainly would like to help you if we can.” Id., at A1046.
The second witness was Vincent Lewis, a fire program specialist for the Department of Homeland Security and a retired fire captain from Michigan. Lewis, who is black, had looked “extensively” at the lieutenant exam and “a little less extensively” at the captain exam. He stated that the candidates “should know that material.” Id., at A1048, A1052. In Lewis’ view, the “questions were relevant for both exams,” and the New Haven candidates had an advantage because the study materials identified the particular book chapters from which the questions were taken. In other departments, by contrast, “you had to know basically the . . . entire book.” Id., at A1053. Lewis concluded that any disparate impact likely was due to a pattern that “usually whites outperform some of the minorities on testing,” or that “more whites . .. take the exam.” Id., at A1054.
The final witness was Janet Helms, a professor at Boston College whose “primary area of expertise” is “not with firefighters per se” but in “race and culture as they influence performance on tests and other assessment procedures.” Id., at A1060. Helms expressly declined the CSB’s offer to review the examinations. At the outset, she noted that “regardless of what kind of written test we give in this country ... we can just about predict how many people will pass *572 who are members of under-represented, groups. And your data are not that inconsistent with what predictions would say were the case.” Id., at A1061. Helms nevertheless offered several “ideas about what might be possible factors” to explain statistical differences in the results. Id., at A1062. She concluded that because 67 percent of the respondents to the job-analysis questionnaires were white, the test questions might have favored white candidates, because “most of the literature on firefighters shows that the different groups perform the job differently.” Id., at A1063. Helms closed by stating that no matter what test the City had administered, it would have revealed “a disparity between blacks and whites, Hispanics and whites,” particularly on a written test. Id., at A1072.
5
At the final CSB meeting, on March 18, Ude (the City’s counsel) argued against certifying the examination results. Discussing the City’s obligations under federal law, Ude advised the CSB that a finding of adverse impact “is the beginning, not the end, of a review of testing procedures” to determine whether they violated the disparate-impact provision of Title VII. Ude focused the CSB on determining “whether there are other ways to test for ... those positions that are equally valid with less adverse impact.” Id., at A1101. Ude described Hornick as having said that the written examination “had one of the most severe adverse impacts that he had seen” and that “there are much better alternatives to identifying [firefighting] skills.” Ibid. Ude offered his “opinion that promotions ... as a result of these tests would not be consistent with federal law, would not be consistent with the purposes of our Civil Service Rules or our Charter[,] nor is it in the best interests of the firefighters ... who took the exams.” Id., at A1103-A1104. He stated that previous Department exams “have not had this kind of result,” and that previous results had not been “challenged as *573 having adverse impact, whereas we are assured that these will be.” Id., at A1107, A1108.
CSB Chairman Segaloff asked Ude several questions about the Title VII disparate-impact standard.
“CHAIRPERSON SEGALOFF: [M]y understanding is the group . . . that is making to throw the exam out has the burden of showing that there is out there an exam that is reasonably probable or likely to have less of an adverse impact. It’s not our burden to show that there’s an exam out there that can be better. We’ve got an exam. We’ve got a result....
“MR. UDE: Mr. Chair, I point out that Dr. Hornick said that. He said that there are other tests out there that would have less adverse impact and that [would] be more valid.
“CHAIRPERSON SEGALOFF: You think that’s enough for us to throw this test upside-down... because Dr. Hornick said it?
“MR. UDE: I think that by itself would be sufficient. Yes. I also would point out that... it is the employer’s burden to justify the use of the examination.” Id., at A1108-A1109.
Karen DuBois-Walton, the City’s chief administrative officer, spoke on behalf of Mayor John DeStefano and argued against certifying the results. DuBois-Walton stated that the results, when considered under the rule of three and applied to then-existing captain and lieutenant vacancies, created a situation in which black and Hispanic candidates were disproportionately excluded from opportunity. DuBoisWalton also relied on Hornick’s testimony, asserting that Hornick “made it extremely clear that . . . there are more appropriate ways to assess one’s ability to serve” as a captain or lieutenant. Id., at A1120.
Burgett (the human resources director) asked the CSB to discard the examination results. She, too, relied on Hor *574 nick’s statement to show the existence of alternative testing methods, describing Hornick as having “started to point out that alternative testing does exist” and as having “begun to suggest that there are some different ways of doing written examinations.” Id., at A1125, A1128.
Other witnesses addressed the CSB. They included the president of the New Haven firefighters’ union, who supported certification. He reminded the CSB that Hornick “also concluded that the tests were reasonable and fair and under the current structure to certify them.” Id., at A1137. Firefighter Frank Ricci again argued for certification; he stated that although “assessment centers in some cases show less adverse impact,” id., at A1140, they were not available alternatives for the current round of promotions. It would take several years, Ricci explained, for the Department to develop an assessment-center protocol and the accompanying training materials. Id., at A1141. Lieutenant Matthew Marcarelli, who had taken the captain’s exam, spoke in favor of certification.
At the close of witness testimony, the CSB voted on a motion to certify the examinations. With one member recused, the CSB deadlocked 2 to 2, resulting in a decision not to certify the results. Explaining his vote to certify the results, Chairman Segaloff stated that “nobody convinced me that we can feel comfortable that, in fact, there’s some likelihood that there’s going to be an exam designed that’s going to be less discriminatory.” Id., at A1159-A1160.
C
The CSB’s decision not to certify the examination results led to this lawsuit. The plaintiffs — who are the petitioners here — are 17 white firefighters and 1 Hispanic firefighter who passed the examinations but were denied a chance at promotions when the CSB refused to certify the test results. They include the named plaintiff, Frank Ricci, who addressed the CSB at multiple meetings.
*575 Petitioners sued the City, Mayor DeStefano, DuBoisWalton, Ude, Burgett, and the two CSB members who voted against certification. Petitioners also named as a defendant Boise Kimber, a New Haven resident who voiced strong opposition to certifying the results. Those individuals are respondents in this Court. Petitioners filed suit under Rev. Stat. §§ 1979 and 1980, 42 U. S. C. §§ 1983 and 1985, alleging that respondents, by arguing or voting against certifying the results, violated and conspired to violate the Equal Protection Clause of the Fourteenth Amendment. Petitioners also filed timely charges of discrimination with the Equal Employment Opportunity Commission (EEOC); upon the EEOC’s issuing right-to-sue letters, petitioners amended their complaint to assert that the City violated the disparate-treatment prohibition contained in Title VII of the Civil Rights Act of 1964, as amended. See 42 U. S. C. § 2000e-2(a).
The parties filed cross-motions for summary judgment. Respondents asserted they had a good-faith belief that they would have violated the disparate-impact prohibition in Title VII, § 2000e-2(k), had they certified the examination results. It follows, they maintained, that they cannot be held liable under Title VII’s disparate-treatment provision for attempting to comply with Title VIPs disparate-impact bar. Petitioners countered that respondents’ good-faith belief was not a valid defense to allegations of disparate treatment and unconstitutional discrimination.
The District Court granted summary judgment for respondents. 554 F. Supp. 2d 142. It described petitioners’ argument as “boil[ing] down to the assertion that if [respondents] cannot prove that the disparities on the Lieutenant and Captain exams were due to a particular flaw inherent in those exams, then they should have certified the results because there was no other alternative in place.” Id., at 156. The District Court concluded that, “ [notwithstanding the shortcomings in the evidence on existing, effective alterna *576 tives, it is not the case that [respondents] must certify a test where they cannot pinpoint its deficiency explaining its disparate impact . . . simply because they have not yet formulated a better selection method.” Ibid. It also ruled that respondents’ “motivation to avoid making promotions based on a test with a racially disparate impact. . . does not, as a matter of law, constitute discriminatory intent” under Title VII. Id., at 160. The District Court rejected petitioners’ equal protection claim on the theory that respondents had not acted because of “discriminatory animus” toward petitioners. Id., at 162. It concluded that respondents’ actions were not “based on race” because “all applicants took the same test, and the result was the same for all because the test results were discarded and nobody was promoted.” Id., at 161.
After full briefing and argument by the parties, the Court of Appeals affirmed in a one-paragraph, unpublished summary order; it later withdrew that order, issuing in its place a nearly identical, one-paragraph per curiam opinion adopting the District Court’s reasoning. 580 F. 3d 87 (CA2 2008). Three days later, the Court of Appeals voted 7 to 6 to deny rehearing en bane, over written dissents by Chief Judge Jacobs and Judge Cabranes. 530 F. 3d 88.
This action presents two provisions of Title VII to be interpreted and reconciled, with few, if any, precedents in the courts of appeals discussing the issue. Depending on the resolution of the statutory claim, a fundamental constitutional question could also arise. We found it prudent and appropriate to grant certiorari. 555 U. S. 1091 (2009). We now reverse.
II
Petitioners raise a statutory claim, under the disparate-treatment prohibition of Title VII, and a constitutional claim, under the Equal Protection Clause of the Fourteenth Amendment. A decision for petitioners on their statutory claim would provide the relief sought, so we consider it first. *577 See Atkins v. Parker, 472 U. S. 115, 123 (1985); Escambia County v. McMillan, 466 U. S. 48, 51 (1984) (per curiam) (“[N]ormally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case”).
A
Title VII of the Civil Rights Act of 1964,42 U. S. C. § 2000e et seq., as amended, prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. Title VII prohibits both intentional discrimination (known as “disparate treatment”) as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as “disparate impact”).
As enacted in 1964, Title VII’s principal nondiscrimination provision held employers liable only for disparate treatment. That section retains its original wording today. It makes it unlawful for an employer “to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race, color, religion, sex, or national origin.” §2000e-2(a)(1); see also 78 Stat. 255. Disparate-treatment cases present “the most easily understood type of discrimination,” Teamsters v. United States, 431 U. S. 324, 335, n. 15 (1977), and occur where an employer has “treated [a] particular person less favorably than others because of” a protected trait, Watson v. Fort Worth Bank & Trust, 487 U. S. 977, 985-986 (1988). A disparate-treatment plaintiff must establish “that the defendant had a discriminatory intent or motive” for taking a job-related action. Id., at 986.
The Civil Rights. Act of 1964 did not include an express prohibition on policies or practices that produce a disparate impact. But in Griggs v. Duke Power Co., 401 U. S. 424 (1971), the Court interpreted the Act to prohibit, in some cases, employers’ facially neutral practices that, in fact, are *578 “discriminatory in operation.” Id., at 431. The Griggs Court stated that the “touchstone” for disparate-impact liability is the lack of “business necessity”: “If an employment practice which operates to exclude [minorities] cannot be shown to be related to job performance, the practice is prohibited.” Ibid.; see also id., at 432 (employer’s burden to demonstrate that practice has “a manifest relationship to the employment in question”); Albemarle Paper Co. v. Moody, 422 U. S. 405, 425 (1975). Under those precedents, if an employer met its burden by showing that its practice was job related, the plaintiff was required to show a legitimate alternative that would have resulted in less discrimination. Ibid. (allowing complaining party to show “that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer’s legitimate interest”).
Twenty years after Griggs, the Civil Rights Act of 1991, 105 Stat. 1071, was enacted. The Act included a provision codifying the prohibition on disparate-impact discrimination. That provision is now in force along with the disparate-treatment section already noted. Under the disparate-impact statute, a plaintiff establishes a prima facie violation by showing that an employer uses “a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.” 42 U. S. C. §2000e-2(k)(l)(A)(i). An employer may defend against liability by demonstrating that the practice is “job related for the position in question and consistent with business necessity.” Ibid. Even if the employer meets that burden, however, a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer’s legitimate needs. §§ 2000e-2(k)(l)(A)(ii) and (C).
B
Petitioners allege that when the CSB refused to certify the captain and lieutenant exam results based on the race of *579 the successful candidates, it discriminated against them in violation of Title VIPs disparate-treatment provision. The City counters that its decision was permissible because the tests “appeared] to violate Title VIPs disparate-impact provisions.” Brief for Respondents 12.
Our analysis begins with this premise: The City’s actions would violate the disparate-treatment prohibition of Title VII absent some valid defense. All the evidence demonstrates that the City chose not to certify the examination results because of the statistical disparity based on race— i. e., how minority candidates had performed when compared to white candidates. As the District Court put it, the City rejected the test results because “too many whites and not enough minorities would be promoted were the lists to be certified.” 554 F. Supp. 2d, at 152; see also ibid, (respondents’ “own arguments . . . show that the City’s reasons for advocating non-certification were related to the racial distribution of the results”). Without some other justification, this express, race-based decisionmaking violates Title VIPs command that employers cannot take adverse employment actions because of an individual’s race. See § 2000e-2(a)(l).
The District Court did not adhere to this principle, however. It held that respondents’ “motivation to avoid making promotions based on a test with a racially disparate impact . . . does not, as a matter of law, constitute discriminatory intent.” Id., at 160. And the Government makes a similar argument in this Court. It contends that the “structure of Title VII belies any claim that an employer’s intent to comply with Title VIPs disparate-impact provisions constitutes prohibited discrimination on the basis of race.” Brief for United States as Amicus Curiae 11. But both of those statements turn upon the City’s objective — avoiding disparate-impact liability — while ignoring the City’s conduct in the name of reaching that objective. Whatever the City’s ultimate aim — however well intentioned or benevolent it might have seemed — the City made its employment decision *580 because of race. The City rejected the test results solely because the higher scoring candidates were white. The question is not whether that conduct was discriminatory but whether the City had a lawful justification for its race-based action.
We consider, therefore, whether the purpose to avoid disparate-impact liability excuses what otherwise would be prohibited disparate-treatment discrimination. Courts often confront cases in which statutes and principles point in different directions. Our task is to provide guidance to employers and courts for situations when these two prohibitions could be in conflict absent a rule to reconcile them. In providing this guidance our decision must be consistent with the important purpose of Title VII — that the workplace be an environment free of discrimination, where race is not a barrier to opportunity.
With these principles in mind, we turn to the parties’ proposed means of reconciling the statutory provisions. Petitioners take a strict approach, arguing that under Title VII, it cannot be permissible for an employer to take race-based adverse employment actions in order to avoid disparate-impact liability — even if the employer knows its practice violates the disparate-impact provision. See Brief for Petitioners 43. Petitioners would have us hold that, under Title VII, avoiding unintentional discrimination cannot justify intentional discrimination. That assertion, however, ignores the fact that, by codifying the disparate-impact provision in 1991, Congress has expressly prohibited both types of discrimination. We must interpret the statute to give effect to both provisions where possible. See, e. g., United States v. Atlantic Research Corp., 551 U. S. 128,137 (2007) (rejecting an interpretation that would render a statutory provision “a dead letter”). We cannot accept petitioners’ broad and inflexible formulation.
Petitioners next suggest that an employer in fact must be in violation of the disparate-impact provision before it can *581 use compliance as a defense in a disparate-treatment suit. Again, this is overly simplistic and too restrictive of Title VIFs purpose. The rule petitioners offer would run counter to what we have recognized as Congress’ intent that “voluntary compliance” be “the preferred means of achieving the objectives of Title VII.” Firefighters v. Cleveland, 478 U. S. 501, 515 (1986); see also Wygant v. Jackson Bd. of Ed., 476 U. S. 267, 290 (1986) (O’Connor, J., concurring in part and concurring in judgment). Forbidding employers to act unless they know, with certainty, that a practice violates the disparate-impact provision would bring compliance efforts to a near standstill. Even in the limited situations when this restricted standard could be met, employers likely would hesitate before taking voluntary action for fear of later being proved wrong in the course of litigation and then held to account for disparate treatment.
At the opposite end of the spectrum, respondents and the Government assert that an employer’s good-faith belief that its actions are necessary to comply with Title VIFs disparate-impact provision should be enough to justify race-conscious conduct. But the original, foundational prohibition of Title VII bars employers from taking adverse action “because of... race.” § 2000e-2(a)(l). And when Congress codified the disparate-impact provision in 1991, it made no exception to disparate-treatment liability for actions taken in a good-faith effort to comply with the new, disparate-impact provision in subsection (k). Allowing employers to violate the disparate-treatment prohibition based on a mere good-faith fear of disparate-impact liability would encourage race-based action at the slightest hint of disparate impact. A minimal standard could cause employers to discard the results of lawful and beneficial promotional examinations even where there is little if any evidence of disparate-impact discrimination. That would amount to a defacto quota system, in which a “focus on statistics .. . could put undue pressure on employers to adopt inappropriate prophylactic measures.” *582 Watson, 487 U. S., at 992 (plurality opinion). Even worse, an employer could discard test results (or other employment practices) with the intent of obtaining the employer’s preferred racial balance. That operational principle could not be justified, for Title VII is express in disclaiming any interpretation of its requirements as calling for outright racial balancing. §2000e-2(j). The purpose of Title VII “is to promote hiring on the basis of job qualifications, rather than on the basis of race or color.” Griggs, 401 U. S., at 434.
In searching for a standard that strikes a more appropriate balance, we note that this Court has considered cases similar to this one, albeit in the context of the Equal Protection Clause of the Fourteenth Amendment. The Court has held that certain government actions to remedy past racial discrimination — actions that are themselves based on race— are constitutional only where there is a “ ‘strong basis in evidence’” that the remedial actions were necessary. Richmond v. J A. Croson Co., 488 U. S. 469, 500 (1989) (quoting Wygant, supra, at 277 (plurality opinion)). This suit does not call on us to consider whether the statutory constraints under Title VII must be parallel in all respects to those under the Constitution. That does not mean the constitutional authorities are irrelevant, however. Our cases discussing constitutional principles can provide helpful guidance in this statutory context. See Watson, supra, at 993 (plurality opinion).
Writing for a plurality in Wygant and announcing the strong-basis-in-evidence standard, Justice Powell recognized the tension between eliminating segregation and discrimination on the one hand and doing away with all governmentally imposed discrimination based on race on the other. 476 U. S., at 277. The plurality stated that those “related constitutional duties are not always harmonious,” and that “reconciling them requires ... employers to act with extraordinary care.” Ibid. The plurality required a strong basis in evidence because “[ejvidentiary support for the conclusion that *583 remedial action is warranted becomes crucial when the remedial program is challenged in court by nonminority employees.” Ibid. The Court applied the same standard in Croson, observing that “an amorphous claim that there has been past discrimination . . . cannot justify the use of an unyielding racial quota.” 488 U. S., at 499.
The same interests are at work in the interplay between the disparate-treatment and disparate-impact provisions of Title VII. Congress has imposed liability on employers for unintentional discrimination in order to rid the workplace of “practices that are fair in form, but discriminatory in operation.” Griggs, supra, at 431. But it has also prohibited employers from taking adverse employment actions “because of” race. §2000e-2(a)(1). Applying the strong-basis-in-evidence standard to Title VII gives effect to both the disparate-treatment and disparate-impact provisions, allowing violations of one in the name of compliance with the other only in certain, narrow circumstances. The standard leaves ample room for employers’ voluntary compliance efforts, which are essential to the statutory scheme and to Congress’ efforts to eradicate workplace discrimination. See Firefighters, supra, at 515. And the standard appropriately constrains employers’ discretion in making race-based decisions: It limits that discretion to cases in which there is a strong basis in evidence of disparate-impact liability, but it is not so restrictive that it allows employers to act only when there is a provable, actual violation.
Resolving the statutory conflict in this way allows the disparate-impact prohibition to work in a manner that is consistent with other provisions of Title VII, including the prohibition on adjusting employment-related test scores on the basis of race. See §2000e-2(l). Examinations like those administered by the City create legitimate expectations on the part of those who took the tests. As is the case with any promotion exam, some of the firefighters here invested substantial time, money, and personal commitment in prepar *584 ing for the tests. Employment tests can be an important part of a neutral selection system that safeguards against the very racial animosities Title VII was intended to prevent. Here, however, the firefighters saw their efforts invalidated by the City in sole reliance upon race-based statistics.
If an employer cannot rescore a test based on the candidates’ race, §2000e-2(0, then it follows a fortiori that it may not take the greater step of discarding the test altogether to achieve a more desirable racial distribution of promotion-eligible candidates — absent a strong basis in evidence that the test was deficient and that discarding the results is necessary to avoid violating the disparate-impact provision. Restricting an employer’s ability to discard test results (and thereby discriminate against qualified candidates on the basis of their race) also is in keeping with Title VII’s express protection of bona fide promotional examinations. See § 2000e-2(h) (“[N]or shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race”); cf. AT&T Corp. v. Hulteen, 556 U. S. 701, 710 (2009).
For the foregoing reasons, we adopt the strong-basis-in-evidence standard as a matter of statutory construction to resolve any conflict between the disparate-treatment and disparate-impact provisions of Title VII.
Our statutory holding does not address the constitutionality of the measures taken here in purported compliance with Title VII. We also do not hold that meeting the strong-basis-in-evidence standard would satisfy the Equal Protection Clause in a future case. As we explain below, because respondents have not met their burden under Title VII, we need not decide whether a legitimate fear of disparate impact is ever sufficient to justify discriminatory treatment under the Constitution.
*585 Nor do we question an employer’s affirmative efforts to ensure that all groups have a fair opportunity to apply for promotions and to participate in the process by which promotions will be made. But once that process has been established and employers have made clear their selection criteria, they may not then invalidate the test results, thus upsetting an employee’s legitimate expectation not to be judged on the basis of race. Doing so, absent a strong basis in evidence of an impermissible disparate impact, amounts to the sort of racial preference that Congress has disclaimed, §2000e-2(j), and is antithetical to the notion of a workplace where individuals are guaranteed equal opportunity regardless of race.
Title VII does not prohibit an employer from considering, before administering a test or practice, how to design that test or practice in order to provide a fair opportunity for all individuals, regardless of their race. And when, during the test-design stage, an employer invites comments to ensure the test is fair, that process can provide a common ground for open discussions toward that end. We hold only that, under Title VII, before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action.
C
The City argues that, even under the strong-basis-in-evidence standard, its decision to discard the examination results was permissible under Title VII. That is incorrect. Even if respondents were motivated as a subjective matter by a desire to avoid committing disparate-impact discrimination, the record makes clear there is no support for the conclusion that respondents had an objective, strong basis in evidence to find the tests inadequate, with some consequent disparate-impact liability in violation of Title VII.
*586 On this basis, we conclude that petitioners have met their obligation to demonstrate that there is “no genuine issue as to any material fact” and that they are “entitled to judgment as a matter of law.” Fed. Rule Civ. Proc. 56(c). On a motion for summary judgment, “facts must be viewed in the light most favorable to the nonmoving party only if there is a ‘genuine’ dispute as to those facts.” Scott v. Harris, 550 U. S. 372, 380 (2007). “Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.” Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U. S. 574, 587 (1986) (internal quotation marks omitted). In this Court, the City’s only defense is that it acted to comply with Title VII’s disparate-impact provision. To succeed on their motion, then, petitioners must demonstrate that there can be no genuine dispute that there was no strong basis in evidence for the City to conclude it would face disparate-impact liability if it certified the examination results. See Celotex Corp, v. Catrett, 477 U. S. 317, 324 (1986) (where the nonmoving party “will bear the burden of proof at trial on a dispositive issue,” the nonmoving party bears the burden of production under Rule 56 to “designate specific facts showing that there is a genuine issue for trial” (internal quotation marks omitted)).
The racial adverse impact here was significant, and petitioners do not dispute that the City was faced with a prima facie case of disparate-impact liability. On the captain exam, the pass rate for white candidates was 64 percent but was 37.5 percent for both black and Hispanic candidates. On the lieutenant exam, the pass rate for white candidates was 58.1 percent; for black candidates, 31.6 percent; and for Hispanic candidates, 20 percent. The pass rates of minorities, which were approximately one-half the pass rates for white candidates, fall well below the 80-percent standard set by the EEOC to implement the disparate-impact provision of Title VII. See 29 CFR § 1607.4(D) (2008) (selection rate that *587 is less than 80 percent “of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact”); Watson, 487 U. S., at 995-996, n. 3 (plurality opinion) (EEOC’s 80-percent standard is “a rule of thumb for the courts”). Based on how the passing candidates ranked and an application of the “rule of three,” certifying the examinations would have meant that the City could not have considered black candidates for any of the then-vacant lieutenant or captain positions.
Based on the degree of adverse impact reflected in the results, respondents were compelled to take a hard look at the examinations to determine whether certifying the results would have had an impermissible disparate impact. The problem for respondents is that a prima facie case of disparate-impact liability — essentially, a threshold showing of a significant statistical disparity, Connecticut v. Teal, 457 U. S. 440, 446 (1982), and nothing more — is far from a strong basis in evidence that the City would have been liable under Title VII had it certified the results. That is because the City could be liable for disparate-impact discrimination only if the examinations were not job related and consistent with business necessity, or if there existed an equally valid, less-discriminatory alternative that served the City’s needs but that the City refused to adopt. §§2000e-2(k)(l)(A), (C). We conclude there is no strong basis in evidence to establish that the tests were deficient in either of these respects. We address each of the two points in turn, based on the record developed by the parties through discovery — a record that concentrates in substantial part on the statements various witnesses made to the CSB.
1
There is no genuine dispute that the examinations were job related and consistent with business necessity. The City’s assertions to the contrary are “blatantly contradicted *588 by the record.” Scott, supra, at 380. The CSB heard statements from Chad Legel (the IOS vice president) as well as City officials outlining the detailed steps IOS took to develop and administer the examinations. IOS devised the written examinations, which were the focus of the CSB’s inquiry, after painstaking analyses of the captain and lieutenant positions — analyses in which IOS made sure that minorities were overrepresented. And IOS drew the questions from source material approved by the Department. Of the outside witnesses who appeared before the CSB, only one, Vincent Lewis, had reviewed the examinations in any detail, and he was the only one with any firefighting experience. Lewis stated that the “questions were relevant for both exams.” CA2 App. A1053. The only other witness who had seen any part of the examinations, Christopher Hornick (a competitor of IOS’), criticized the fact that no one within the Department had reviewed the tests — a condition imposed by the City to protect the integrity of the exams in light of past alleged security breaches. But Hornick stated that the exams “appea[r] to be . . . reasonably good” and recommended that the CSB certify the results. Id., at A1041.
Arguing that the examinations were not job related, respondents note some candidates’ complaints that certain examination questions were contradictory or did not specifically apply to firefighting practices in New Haven. But Legel told the CSB that IOS had addressed those concerns— that it entertained “a handful” of challenges to the validity of particular examination questions, that it “reviewed those challenges and provided feedback [to the City] as to what we thought the best course of action was,” and that he could remember at least one question IOS had thrown out (“offer-ting] credit to everybody for that particular question”). Id., at A955-A957. For his part, Hornick said he “suspect[ed] that some of the criticisms ... [leveled] by candidates” were not valid. Id., at A1035.
*589 The City, moreover, turned a blind eye to evidence that supported the exams’ validity. Although the City’s contract with IOS contemplated that IOS would prepare a technical report consistent with EEOC guidelines for examination-validity studies, the City made no request for its report. After the January 2004 meeting between Legel and some of the City-official respondents, in which Legel defended the examinations, the City sought no further information from IOS, save its appearance at a CSB meeting to explain how it developed and administered the examinations. IOS stood ready to provide respondents with detailed information to establish the validity of the exams, but respondents did not accept that offer.
2
Respondents also lacked a strong basis in evidence of an equally valid, less discriminatory testing alternative that the City, by certifying the examination results, would necessarily have refused to adopt. Respondents raise three arguments to the contrary, but each argument fails. First, respondents refer to testimony before the CSB that a different composite-score calculation — weighting the written and oral examination scores 30/70 — would have allowed the City to consider two black candidates for then-open lieutenant positions and one black candidate for then-open captain positions. (The City used a 60/40 weighting as required by its contract with the New Haven firefighters’ union.) But respondents have produced no evidence to show that the 60/40 weighting was indeed arbitrary. In fact, because that formula was the result of a union-negotiated collective-bargaining agreement, we presume the parties negotiated that weighting for a rational reason. Nor does the record contain any evidence that the 30/70 weighting would be an equally valid way to determine whether candidates possess the proper mix of job knowledge and situational skills to earn promotions. Changing the weighting formula, moreover, could well have violated Title VII’s prohibition of altering test scores on the *590 basis of race. See § 2000e-2(l). On this record, there is no basis to conclude that a 30/70 weighting was an equally valid alternative the City could have adopted.
Second, respondents argue that the City could have adopted a different interpretation of the “rule of three” that would have produced less discriminatory results. The rule, in the New Haven city charter, requires the City to promote only from “those applicants with the three highest scores” on a promotional examination. New Haven, Conn., Code of Ordinances, Tit. I, Art. XXX, §160 (1993). A state court has interpreted the charter to prohibit so-called “banding”— the City’s previous practice of rounding scores to the nearest whole number and considering all candidates with the same whole-number score as being of one rank. Banding allowed the City to consider three ranks of candidates (with the possibility of multiple candidates filling each rank) for purposes of the rule of three. See Kelly v. New Haven, No. CV000444614,2004 WL 114377, *3 (Conn. Super. Ct., Jan. 9, 2004). Respondents claim that employing banding here would have made four black and one Hispanic candidates eligible for then-open lieutenant and captain positions.
A state court’s prohibition of banding, as a matter of municipal law under the charter, may not eliminate banding as a valid alternative under Title VII. See 42 U. S. C. § 2000e-7. We need not resolve that point, however. Here, banding was not a valid alternative for this reason: Had the City reviewed the exam results and then adopted banding to make the minority test scores appear higher, it would have violated Title VIPs prohibition of adjusting test results on the basis of race. §2000e-2(Z); see also Chicago Firefighters Local 2 v. Chicago, 249 F. 3d 649, 656 (CA7 2001) (Posner, J.) (“We have no doubt that if banding were adopted in order to make lower black scores seem higher, it would indeed be ... forbidden”). As a matter of law, banding was not an alternative available to the City when it was considering whether to certify the examination results.
*591 Third, and finally, respondents refer to statements by Hornick in his telephone interview with the CSB regarding alternatives to the written examinations. Hornick stated his “belie[f]” that an “assessment center process,” which would have evaluated candidates’ behavior in typical job tasks, “would have demonstrated less adverse impac[t].” CA2 App. A1039. But Hornick’s brief mention of alternative testing methods, standing alone, does not raise a genuine issue of material fact that assessment centers were available to the City at the time of the examinations and that they would have produced less adverse impact. Other statements to the CSB indicated that the Department could not have used assessment centers for the 2003 examinations. Supra, at 574. And although respondents later argued to the CSB that Hornick had pushed the City to reject the test results, supra, at 572-574, the truth is that the essence of Hornick’s remarks supported its certifying the test results. See Scott, 550 U. S., at 380. Hornick stated that adverse impact in standardized testing “has been in existence since the beginning of testing,” CA2 App. A1037, and that the disparity in New Haven’s test results was “somewhat higher but generally in the range that we’ve seen professionally,” id., at A1030-A1031. He told the CSB he was “not suggesting” that IOS “somehow created a test that had adverse impacts that it should not have had.” Id., at A1038. And he suggested that the CSB should “certify the list as it exists.” Id., at A1041.
Especially when it is noted that the strong-basis-in-evidence standard applies, respondents cannot create a genuine issue of fact based on a few stray (and contradictory) statements in the record. And there is no doubt respondents fall short of the mark by relying entirely on isolated statements by Hornick. Hornick had not “studied] the test at length or in detail.” Id., at A1030. And as he told the CSB, he is a “direct competitor” of IOS’. Id., at A1029. The remainder of his remarks showed that Hornick’s pri *592 mary concern — somewhat to the frustration of CSB members — was marketing his services for the future, not commenting on the results of the tests the City had already administered. See, e. g., id., at A1026, A1027, A1032, A1036, A1040, A1041. Hornick’s hinting had its intended effect: The City has since hired him as a consultant. As for the other outside witnesses who spoke to the CSB, Vincent Lewis (the retired fire captain) thought the CSB should certify the test results. And Janet Helms (the Boston College professor) declined to review the examinations and told the CSB that, as a society, “we need to develop a new way of assessing people.” Id., at A1073. That task was beyond the reach of the CSB, which was concerned with the adequacy of the test results before it.
3
On the record before us, there is no genuine dispute that the City lacked a strong basis in evidence to believe it would face disparate-impact liability if it certified the examination results. In other words, there is no evidence — let alone the required strong basis in evidence — that the tests were flawed because they were not job related or because other, equally valid and less discriminatory tests were available to the City. Fear of litigation alone cannot justify an employer’s reliance on race to the detriment of individuals who passed the examinations and qualified for promotions. The City’s discarding the test results was impermissible under Title VII, and summary judgment is appropriate for petitioners on their disparate-treatment claim.
* * *
The record in this litigation documents a process that, at the outset, had the potential to produce a testing procedure that was true to the promise of Title VII: No individual should face workplace discrimination based on race. Re *593 spondents thought about promotion qualifications and relevant experience in neutral ways. They were careful to ensure broad racial participation in the design of the test itself and its administration. As we have discussed at length, the process was open and fair.
The problem, of course, is that after the tests were completed, the raw racial results became the predominant rationale for the City’s refusal to certify the results. The injury arises in part from the high, and justified, expectations of the candidates who had participated in the testing process on the terms the City had established for the promotional process. Many of the candidates had studied for months, at considerable personal and financial expense, and thus the injury caused by the City’s reliance on raw racial statistics at the end of the process was all the more severe. Confronted with arguments both for and against certifying the test results — and threats of a lawsuit either way — the City was required to make a difficult inquiry. But its hearings produced no strong evidence of a disparate-impact violation, and the City was not entitled to disregard the tests based solely on the racial disparity in the results.
Our holding today clarifies how Title VII applies to resolve competing expectations under the disparate-treatment and disparate-impact provisions. If, after it certifies the test results, the City faces a disparate-impact suit, then in light of our holding today it should be clear that the City would avoid disparate-impact liability based on the strong basis in evidence that, had it not certified the results, it would have been subject to disparate-treatment liability.
Petitioners are entitled to summary judgment on their Title VII claim, and we therefore need not decide the underlying constitutional question. The judgment of the Court of Appeals is reversed, and the cases are remanded for further proceedings consistent with this opinion.

It is so ordered.