**12-1006-cv**
*Mark Maraschiello v. City of Buffalo Police Department*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

—————————————

August Term, 2012

(Argued: February 1, 2013    Decided: February 27, 2013)

Docket No. 12-1006-cv

—————————————

MARK R. MARASCHIELLO,

*Plaintiff-Appellant*,

-v.-

CITY OF BUFFALO POLICE DEPARTMENT, H. MCCARTHY GIPSON,

*Defendants-Appellees*,

—————————————

Before:
WALKER, CABRANES, AND WESLEY, *Circuit Judges*

—————————————

Plaintiff-Appellant Mark Maraschiello sued the City of Buffalo Police Department and its police chief for racial discrimination after the results of a civil service examination were replaced by the results of an updated version. The United States District Court for the Western District of New York (Arcara, *J.*) granted defendants' motion for summary judgment, finding that *Ricci v. DeStefano*, 557 U.S. 557 (2009), did not indicate that defendants' actions were prohibited. We affirm.

—————————————

RICHARD J. PERRY, JR. (Lindy Korn, *on the brief*), Law Office of Lindy Korn, Buffalo, NY, *for Appellant.*

JOSHUA FEINSTEIN, Hodgson Russ LLP, Buffalo, NY, *for Appellee City of Buffalo Police Department.*

TERRENCE M. CONNORS (James W. Grable, Jr., *on the brief*), Connors & Vilardo, LLP, Buffalo, NY, *for Appellee H. McCarthy Gipson.*

---

WESLEY, Circuit Judge:

Mark Maraschiello, a white male employed as a captain in the City of Buffalo Police Department (the "Department"), sued the Department and its police chief, H. McCarthy Gipson (collectively "defendants"), claiming that their failure to promote him was impermissibly motivated by race. Maraschiello's scores on a 2006 civil service examination rendered him eligible for promotion to the position of inspector. After Buffalo adopted the results of a new exam two years later, however, another officer was promoted to an open inspector position. Maraschiello contends that this amounted to racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1983; and the Equal Protection Clause of the Fourteenth Amendment. The United States District Court for

2

the Western District of New York (Arcara, *J.*) adopted Magistrate Judge Leslie G. Foschio's report and recommendation granting summary judgment in favor of defendants. *See Maraschiello v. City of Buffalo Police Dep't*, No. 10-CV-00187A(F), 2011 WL 7395095 (Sept. 13, 2011). We affirm.

## Facts

Maraschiello, a white man, has at all relevant times been employed by the Department as a captain. The Department bases its promotional decisions for several positions, including that of inspector, on the results of a civil service exam. In accordance with New York law, the City of Buffalo (the "City") may promote any one of the three top scorers on a given exam. *See* N.Y. Civ. Serv. Law § 61[1] ("Appointment or promotion from an eligible list to a position in the competitive class shall be made by the selection of one of the three persons certified by the appropriate civil service commission as standing highest on such eligible list who are willing to accept such appointment or promotion . . . ."). Maraschiello took the exam required for the inspector position on September 16, 2006. He received the highest grade on the exam and ranked

3

first on a list of candidates that was certified on December 13, 2006.  The parties do not dispute that the exam qualified Maraschiello and the other two top scorers for promotion to inspector at any time while the 2006 list remained in effect.  For most of this period, however, there were no open inspector positions.

During this time, the City of Buffalo ("the City") was going through the process of adopting a new police promotion exam.  Defendants submitted evidence that, in October 2006, the City engaged personnel psychologist Nancy Abrams to review the civil service exams.  Abrams submitted an affidavit stating that "[i]n part prompted" by "several federal civil rights actions . . . challenging the City's use of examinations prepared by the New York State Department of Civil Service," the City "requested that [she] review the Police promotional exams prepared by NYS Civil Service . . . to evaluate whether they were valid examinations that selected the candidates best suited for the job and otherwise complied with applicable legal and professional standards for employment examinations."  Joint App'x 88-89.  Abrams concluded that the civil service agency had not updated the job analysis in nearly thirty years and

4

that it was out of date, in part because its reliance on multiple-choice questions was not "optimal for police work and other fields requiring qualities – such as effective oral communication and the ability to assume command of situations – that are difficult to evaluate through such traditional methods." *Id.* at 90-91. Abrams discussed these conclusions with City officials, and "[a]fter receiving [her] conclusions, the City published a request for proposals [("RFP")] in April 2007 for an independent consultant to develop new Civil Service examinations." *Id.* at 91. Abrams "assisted the City in designing the RFP and evaluating the responses received to accomplish these goals and provide Buffalo with a better exam." *Id.* at 91-92.

The City issued the "Request for Proposals for Development of Police Promotional Examinations" on April 27, 2007. The RFP began by reciting the "Regulations" governing the bidding. *Id.* at 55-58. Of note is that the section includes a provision entitled "Method of Tendering Proposals." *Id.* at 55. That provision contains three subsections. The first establishes that "all bidders must tender their proposal on the form furnished with these specifications"; the second states that no entity shall

5

submit more than one proposal; and the third states the following:

> All bidders must submit with their bid a statement indicating that they will work toward a minority workforce goal of 25%, and woman workforce goal of 5%. In addition, a statement must be submitted indicating that the bidder will work toward a business utilization goal for minority business enterprise of 25% and woman business enterprise of 5%.

*Id.* (emphasis omitted).

After the Regulations section, the RFP describes in detail the sort of examinations it sought. It begins with the following paragraph:

> The City of Buffalo (the "City") has traditionally used examinations prepared by the New York State Department of Civil Service for examining candidates for promotional titles within the Buffalo Police and Fire Departments. In 1973 and 1974, civil lawsuits were brought against the City alleging discrimination in entry-level hiring in the Police and Fire Departments. In 1978, the Court found there was discrimination, and the Court has been overseeing various remedies since that time. The City remains under Court supervision with respect to entry-level hiring in both departments. Further, in 1998 and in 2002, civil lawsuits were brought against the City in which the examination for promotion to fire lieutenant was alleged to have a discriminatory impact against African-American candidates. Those lawsuits are still pending as of the date of this Request for Proposals. Although the City denies that the examinations previously used were discriminatory, it has decided to cease using the examinations prepared by the New York State Department of Civil Service for Police Officer and Firefighter promotional titles and therefore is issuing this Request for Proposals for the development of its own examinations.

6

*Id.* at 60.  The RFP contains further provisions detailing the scope of the work – establishing, *inter alia*, that the proposed tests must deal with job requirements and scoring procedures.  *Id.* at 60-70.  It also states that "testing instruments and procedures must conform to Title VII . . . ; to this end, they must be free from non-job related factors which might function as biases against any group on the basis of race, color, religion, sex, age, national origin, or any other classification protected by law."  *Id.* at 61.

In late 2007 and early 2008, the City selected Industrial/Organization Solutions, Inc. from among various bidders, and the two entities collaborated in developing a promotional exam consisting of both a written test and an oral assessment.  After the development process was complete, the City announced and administered the new exam for the inspector position in two parts: the written component in February 2008 and the oral component on March 31, 2008.  Maraschiello elected not to take the 2008 test; he does not allege that he was in any way prevented from doing so.

On March 18, 2008, Gipson issued Special Order No. 2008-48, which stated: "Inspector Philip Ramunno, assigned

to the B District, has been granted a service pension in the New York State Retirement System effective March 18, 2008." *Id.* at 75.

On April 16, 2008, after the new test was scored, the City adopted a new inspector list, and the 2006 eligibility list automatically expired. Patrick Reichmuth, who is a white male (as was every candidate on both the 2006 and 2008 lists), placed first on the 2008 list. Reichmuth had been second on the 2006 list. Maraschiello did not appear on the 2008 list, which is not surprising given his failure to take the test. On June 16, 2008, Reichmuth was appointed to fill the vacancy created by Ramunno's retirement.

**District Court Proceedings**

After exhausting his administrative remedies, Maraschiello filed a four-count complaint in district court on March 5, 2010. He asserted claims of unlawful discrimination under Title VII, § 1983, and the Equal Protection Clause of the Fourteenth Amendment. He also asserted a state-law claim for defamation based on an alleged statement by Gipson, in the context of promotion discussions, that Maraschiello "was a racist." Joint App'x 14.

8

Defendants filed a motion to dismiss the complaint pursuant to Rule 12(b)(6), asserting that Maraschiello's claim did not involve the sort of impermissibly race-based action described in *Ricci v. DeStefano*, 557 U.S. 557 (2009). The district court denied the motion, noting that Maraschiello had alleged that after the adoption of the 2006 exam results, the city solicited bids for new exams with the purpose of "increas[ing] minority representation on the force."  Joint App'x 30.  The court then noted:

> Defendants have failed to distinguish *Ricci* from the facts of this case.  Based upon plaintiff's allegations, it would appear that *Ricci* applies to plaintiff's discrimination claims.  Plaintiff asserts that the city discarded the 2006 exam results because it wanted to increase minority representation on the police force.  Defendants do not dispute this point, and, in fact, expressly acknowledge that the City had endured "numerous legal challenges to the validity of the civil service examinations" over the past few decades and that the new exams were created "to avoid further litigation with respect to those exams."  In light of *Ricci* and plaintiff's allegations that the 2006 exam results were discarded for the purpose of avoiding further claims of racial discrimination, defendant's motion to dismiss plaintiff's discrimination claims is denied.

*Id.* at 31-32 (internal citation omitted).

In January 2011, after some discovery, Maraschiello moved for partial summary judgment on the issue of liability.  Gipson cross-moved for summary judgment

dismissing the Title VII claims against him in his individual capacity. Magistrate Judge Foschio recommended that the district court deny Maraschiello's motion, grant summary judgment *sua sponte* for all defendants on the federal claims, and decline to exercise supplemental jurisdiction over the defamation claim.

Judge Foschio first found that defendants could not be held liable under Title VII based on *Ricci* because the case was factually distinguishable. *Maraschiello*, 2011 WL 7395095, at *7-8. Judge Foschio found further that the other evidentiary bases for Maraschiello's claim were insufficient: Maraschiello's contentions that the RFP statement regarding a 25% minority workforce referred to the police workforce rather than a bidding contractor's workforce were unavailing; Maraschiello never sat for the 2008 exam; and the person who was eventually promoted was, like Maraschiello, a white man. *Id.* at *8-10.

Judge Foschio went on to determine that Maraschiello could not maintain a claim under § 1983 because he had no cognizable property right to the inspector position and that Maraschiello's equal protection claim was moot in the absence of a viable discrimination claim under the other two

10

statutes.  *Id.* at *11-12.  Finally, Judge Foschio recommended that the district court decline to exercise supplemental jurisdiction over the defamation claim because the case was at a relatively early stage and a state-court action would not be barred by the statute of limitations. *Id.* at *14.

After Judge Foschio issued the recommendation and report on September 13, 2011, Maraschiello filed objections. On December 19, 2011, the district court held oral argument on whether the recommendation and report should be adopted. In order to provide additional notice to Maraschiello before acting on the recommendation to grant summary judgment to all defendants *sua sponte*, the district court permitted supplemental briefing, which the parties filed in due course.  On January 24, 2012, the district court held a second hearing to afford the parties a further opportunity to present their respective positions.  Finally, on February 16, 2012, the district court issued a decision adopting Judge Foschio's proposed findings and dismissing the case.

**Discussion**

Maraschiello's brief on appeal contains no discussion of the § 1983 or defamation claims and only three sentences

11

of unsupported argument regarding his equal protection claim. *See* Appellant's Br. at 16. "Merely mentioning or simply stating an issue in an appellate brief is insufficient to preserve it for our review: an appellant must advance an argument, and we generally will decline to consider issues that are not sufficiently argued." *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012) (internal quotation marks and brackets omitted). Thus, it is only necessary for us to consider Maraschiello's arguments regarding Title VII.[1]

"We review an order granting summary judgment *de novo*, drawing all factual inferences in favor of the non-moving party." *Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 120-21 (2d Cir. 2012). "[W]e affirm only where we are able to conclude, after construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor, that 'there is no genuine dispute as to any material fact

---

[1] Because we conclude that Maraschiello's Title VII claim fails, and "[t]he elements of [a Title VII claim] are generally the same as the elements of [an equal protection claim] and the two must stand or fall together," *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004), his equal protection claim would fail in any event.

12

and the movant is entitled to judgment as a matter of law.'" *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).

**I.**

Title VII claims are generally "analyzed under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973), and its progeny." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008). At the first stage of *McDonnell Douglas*, a plaintiff "bears the burden of establishing a *prima facie* case of discrimination," which includes demonstrating that "he suffered an adverse employment action . . . under circumstances giving rise to an inference of discriminatory intent." *Id.* "Once the *prima facie* case has been shown, 'the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011) (quoting *McDonnell Douglas*, 411 U.S. at 802).

A plaintiff may also attempt more directly to "convince the trier of fact that an impermissible criterion in fact entered into the employment decision" by "focus[ing] his

13

proof directly at the question of discrimination and prov[ing] that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir. 1992) (citation omitted). If the employee does so, he is "entitled to succeed subject only to the employer's opportunity to prove its affirmative defense, that is, that it would have reached the same decision as to [the employee's employment] even in the absence of the impermissible factor." *Id.* (internal quotation marks and citations omitted).

Maraschiello's central contention is that *Ricci* establishes that defendants' actions violated Title VII. Repeated references in his brief to a "*Ricci* theory" or "*Ricci* analysis" suggest that he is arguing that the case established a new framework for Title VII litigation. It did not. As we have explained, "*Ricci* does not impose a new . . . summary-judgment burden-shifting framework, but instead constitutes . . . a straightforward application of the first two steps of *McDonnell Douglas*." *Brennan*, 650 F.3d at 93-94. Because *Ricci* involved a factual scenario

14

somewhat similar to Maraschiello's, however, it is worth discussing that case in some detail.

In *Ricci*, a group of New Haven firefighters had taken examinations necessary to qualify for promotions. 557 U.S. at 562. "When the examination results showed that white candidates had outperformed minority candidates," New Haven agreed with other firefighters who "argued [that] the tests should be discarded [prior to certification of the results] because the results showed the tests to be discriminatory." *Id.* New Haven "threw out the examinations" based on the racial disparity reflected in the results. *Id.* The plaintiff firefighters alleged that discarding the results discriminated against them based on their race, in violation of Title VII's prohibition of disparate treatment. New Haven countered that "if they had certified the results, they could have faced liability under Title VII for adopting a practice that had a disparate impact on the minority firefighters." *Id.* at 563.

The Supreme Court's analysis began with the premise that, absent a valid defense, New Haven's actions would violate the disparate-treatment prohibition because "[a]ll the evidence demonstrate[d] that [New Haven] chose not to

15

certify the examination results because of the statistical disparity based on race – *i.e.,* . . . because too many whites and not enough minorities would be promoted were the lists to be certified." *Id.* at 579 (internal citation and quotation marks omitted). "Whatever [New Haven's] ultimate aim – however well intentioned or benevolent it might have seemed – [New Haven] made its employment decision because of race [and] rejected the test results solely because the higher scoring candidates were white." *Id.* at 579-80. "[T]he original, foundational prohibition of Title VII bars employers from taking adverse action 'because of . . . race.'" *Id.* at 581 (quoting 42 U.S.C. § 2000e-2(a)(1)). This prohibition was violated when "the firefighters saw their efforts invalidated by [New Haven] in sole reliance upon race-based statistics." *Id.* at 584.

"In other words, because [New Haven's] decision to reject the test results was explicitly based on a statistical racial disparity, it was beyond dispute that the plaintiffs had made out a *prima facie* case, so the burden shifted to the defendants to give a legitimate justification for the adverse employment action." *Brennan*, 650 F.3d at 93. The Court thus turned to the question of "whether the

16

purpose to avoid disparate-impact liability excuses what otherwise would be prohibited disparate-treatment discrimination." *Ricci*, 557 U.S. at 580. It rejected the plaintiffs' contention that an employer could never take race-based adverse employment actions in order to avoid disparate-impact liability, finding that so "broad and inflexible [a] formulation" would impermissibly nullify Congressional intent to stamp out racially disparate impact along with disparate treatment. *Id.* On the other hand, the Court also rejected New Haven's argument that city officials could "violate the disparate-treatment prohibition based on a mere good-faith fear of disparate-impact liability" because that "would encourage race-based action at the slightest hint of disparate impact," and "Title VII is express in disclaiming any interpretation of its requirements as calling for outright racial balancing." *Id.* at 581-82.

The Court concluded that it was appropriate to "constrain[] employers' discretion in making race-based decisions . . . to cases in which there is a strong basis in evidence of disparate-impact liability," although this does not require a "provable, actual violation." *Id.* at 583.

17

Thus, an employer may not discard a test "to achieve a more desirable racial distribution of promotion-eligible candidates – absent a strong basis in evidence that the test was deficient and that discarding the results is necessary to avoid violating the disparate-impact provision." *Id.* at 584. The Court held that the scoring disparity on the New Haven test results could not provide that basis absent evidence either that "the examinations were not job related and consistent with business necessity" or that "there existed an equally valid, less-discriminatory alternative that served [New Haven's] needs but that [New Haven] refused to adopt." *Id.* at 587. "Fear of litigation alone cannot justify an employer's reliance on race to the detriment of individuals who passed the examinations and qualified for promotions." *Id.* at 592.

To subject the defendants to Title VII liability, Maraschiello must either provide direct evidence of discrimination or establish, as part of a *prima facie* case under *McDonnell Douglas*, that he experienced an adverse employment action "under circumstances giving rise to an inference of discrimination." *Brennan*, 650 F.3d at 93 (internal quotations omitted). If he does so, the burden

18

shifts to the City to justify its conduct, perhaps by establishing a strong basis in evidence that it would otherwise have been subject to a disparate-impact claim. Because we find that Maraschiello has failed to provide evidence from which a reasonable jury could conclude that he suffered a discriminatory action under either framework, we need not consider the justification issue.

Maraschiello's argument regarding the adverse employment action he suffered was stated most clearly by his counsel at oral argument before the district court after Judge Foschio issued the Report and Recommendation:

> When the vacancy came into existence, they chose not to select him. They chose to use the new test which is designed for a racial reason, and unless they can show the necessary justifications then that's a facially racial decision. . . .
>
> The Supreme Court starts with that premise that if you determine to change your test for fear of race – disparate impact, racial disparate impact, if you make that decision it's a race-conscious decision. And if you then harm someone by it that's the discrimination. . . . They picked the race test versus the test that could have promoted him. If they had picked the 2006 test he would not have a *Ricci* claim at all. He absolutely wouldn't.

Joint App'x 279-81. Maraschiello's claim thus appears to center on the 30-day period between Inspector Ramunno's retirement (on March 18, 2008) and the adoption of the 2008

19

eligibility list (on April 16, 2008).  Construed most generously, his argument is that, immediately upon Ramunno's retirement, the City should have made its promotion decision from the 2006 list that included Maraschiello but that the City instead chose to delay the appointment decision for a month in order to use the results of the new test, which was adopted "for a racial reason."  Thus, according to Maraschiello, he was denied his shot at the promotion in the same way and for the same reasons as the firefighters in *Ricci*.

This argument cannot succeed.  In *Ricci*, the defendants threw out the results of a test based on the racial disparity reflected in those particular results, denying the firefighters who had taken it any chance of a promotion.  In this case, Maraschiello's results were certified, and he was eligible for a promotion for over a year.  More important, however, is the manner in which Maraschiello's eligibility expired.  Unlike in *Ricci*, where the results of a specific test were simply discarded based on the racial statistics reflected in the results, here the City replaced the 2006 list with the 2008 list after spending more than a year

preparing to revise its assessment methods.[2]  Its problem was with the test itself, rather than with a particular set of results.  The City administered the first phase of the 2008 test in February, which was before the inspector position Maraschiello desired became vacant.  Maraschiello chose not to take this test even before he knew that a position would be open.  In short, the City was already in the process of preparing to replace the eligibility list – a process in which Maraschiello chose not to participate.  This process, even though it eventually resulted in the automatic invalidation of the 2006 list, was not a rejection of that list for its own sake.

We do not read *Ricci* as confined to situations involving the discarding of civil service test results based on the disparity those results reflect.  Rather, the case establishes more generally that "before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to

---

[2] The City's replacement of the 2006 list complied with the requirements of New York law that certified test fresults remain in place for at least one year.  N.Y. Civ. Serv. Law § 56[1] ("The duration of an eligible list shall be fixed at not less than one nor more than four years . . . .").

believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." *Ricci*, 557 U.S. at 585; *see Briscoe v. City of New Haven*, 654 F.3d 200, 206-07 (2d Cir. 2011). In other words, it articulates the contours of a specific affirmative defense to claims of unlawful disparate treatment based on race – it does not expressly limit what may constitute disparate treatment.

Nonetheless, Maraschiello's arguments are unavailing. Even if it were determined that the City's choice to adopt a new test was motivated in part by its desire to achieve more racially balanced results – and there is evidence in the record that at least suggests this – Maraschiello cannot demonstrate that the generalized overhaul of departmental promotional requirements amounted to the sort of race-based adverse action discussed in *Ricci.* Indeed, *Ricci* specifically permits an employer to "consider[], before administering a test or practice, how to design that test or practice in order to provide a fair opportunity for all individuals, regardless of race." 557 U.S. at 585.

Although Abrams' statements regarding the reasons for this replacement are unnecessary for our conclusion, they lend it strong support. The statements indicate that the City chose to update its testing requirements, and subsequently its eligibility list, for reasons that had much more to do with an advanced understanding of job qualifications than with racial statistics. Maraschiello has not attempted to dispute this evidence. Completing the last phase of a long-planned adoption of a new standard is a far cry from rejecting a set of results out of hand because of their racial makeup. Updating an examination, a process specifically permitted by statute, does not "create[ ] a materially significant disadvantage with respect to the terms of . . . employment." *See Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (internal quotation marks omitted).

Maraschiello's only other suggestion that the exam update was discriminatory comes from the 25% language in the RFP. This language does not support his claim. The City submitted evidence, in the form of an affidavit by the Director of Civil Services in the City's Human Resources department, that the 25% language is mandated by the city

23

code whenever the City solicits bids for work. Joint App'x 79. The affidavit included the relevant section of the code, § 96-13F, which states:

> The advertisement inviting bids for the doing of a work or improvement or for the furnishings of materials, supplies, or equipment shall among other things state that the bidder must submit prior to the awarding of a contract, a statement indicating that the bidder will work toward a minority workforce goal of 25%, and women workforce goal of 5%. In addition, a statement must be submitted prior to the awarding of a contract indicating that the bidder will work toward a business utilization goal for minority business enterprise of 25% and women business enterprise of 5%. These goals shall be utilized for all purchasing, professional services and construction contracts. In addition, all departments and City of Buffalo agencies must include in all bid specifications the minority workforce and business utilization goals as stated in this section.

Joint App'x 83. Although portions of this language considered in isolation might theoretically allow for multiple interpretations regarding which workforce a bidder must work to affect, the context makes crystal clear that it refers to the bidder's workforce rather than the City's. The language refers to all bids, including those to furnish materials or improve physical facilities – jobs which have no effect on city employment. The requirement that this language be included in all bid advertisements – not just those, like the promotion-examination advertisement, that

24

might end up having an effect on the City's workforce – belies Maraschiello's contentions.

Maraschiello has provided neither direct evidence of discrimination nor evidence from which a reasonable jury could infer that discrimination occurred during the City's process of updating and administering its promotion exam. His Title VII claim thus cannot succeed to the extent that it concerns this process.

Maraschiello's only remaining evidence is Gipson's supposed comment that Maraschiello was a "racist." This alleged remark similarly cannot support a claim that the failure to promote him was on the basis of his race, despite Maraschiello's conclusory and unsupported argument that it "constitutes a clearly race-based bias." Appellant's Br. at 15. As defendants point out, the person eventually appointed instead of Maraschiello was also a white man. Even if this was not the case, a statement that someone is a "racist," while potentially indicating unfair dislike, does not indicate that the object of the statement is being rejected *because of his race*. *See Holcomb v. Iona College*, 521 F.3d 130, 139 (2d Cir. 2008) (noting that Title VII will support a claim by an "employee [who] suffers discrimination

because of the employee's *own* race" (emphasis in original)). "Racism" is not a race, and discrimination on the basis of alleged racism is not the same as discrimination on the basis of race.

Maraschiello provides no other evidence of unlawful discrimination, and his Title VII claim therefore fails in its entirety.

**II.**

Finally, Maraschiello argues that the district court's denial of defendants' motion to dismiss created binding law of the case regarding the viability of his Title VII claim and that the district court inappropriately granted summary judgment *sua sponte*. Neither of these claims can succeed.

The doctrine of law of the case is "discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). And in any event, the doctrine would not preclude a district court from granting summary judgment based on evidence after denying a motion to dismiss based only on the plaintiff's allegations. *See id.* The district court's decision on the motion to dismiss depended on Maraschiello's

26

allegation that "the city discarded the 2006 exam results because it wanted to increase minority representation on the police force." Joint App'x 31. The evidence reflects that the situation was a good deal more complicated. It was not error for the court to revisit a conclusion based on factual allegations taken as true at the motion to dismiss stage, and determine, based on undisputed evidence at the summary judgment stage, that no reasonable jury could find that the type of action discussed in *Ricci* occurred. *See Brown v. City of Syracuse*, 673 F.3d 141, 148 (2d Cir. 2012).

As explained in his brief, Maraschiello's second argument amounts to a contention that the district court failed to view the evidence in his favor, rather than a claim that he was denied procedural protections. *See* Appellant's Br. at 12-15. He does not dispute that after Judge Foschio recommended *sua sponte* summary judgment, he was afforded the opportunity to file objections, engage in oral argument, file additional briefing, and engage in additional argument. This constituted adequate procedural protection. *See* Fed. R. Civ. P. 56(f)(3) (governing the granting of summary judgment *sua sponte*); *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011). The

27

District Court fully complied with the mandates of Rule 56(f) and did not err in granting summary judgment *sua sponte*.

## Conclusion

We have examined all of Maraschiello's arguments on appeal and find them to be without merit.  For the foregoing reasons, the judgment of the district court granting summary judgment for defendants is **AFFIRMED.**