=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 7
Eugene Margerum, et al.,
          Appellants-Respondents,
          v.
City of Buffalo, et al.,
          Respondents-Appellants.


          Andrew P. Fleming, for appellants-respondents.
          Jason E. Markel, for respondents-appellants.
          National Association of Hispanic Firefighters; Buffalo
Professional Firefighters Association et al.; National
Association for the Advancement of Colored People; International
Municipal Lawyers Association et al.; Pacific Legal Foundation et
al., amici curiae.




LIPPMAN, Chief Judge:

          We hold that a notice of claim need not be filed for a

Human Rights Law claim against a municipality and that plaintiffs

should not have been granted summary judgment on the issue of

liability involving discrimination as to civil service lists for

- 1 -

Buffalo firefighters.  We therefore remit for further proceedings.

In 1974, the United States sued the City of Buffalo in the Western District of New York.  Among other things, the suit alleged that the written civil service examination developed by the New York State Department of Civil Service and used by the City to select entry-level firefighters and police officers had a discriminatory adverse impact against minorities.  The District Court found that the City's continued use of the State's examination was part of a pattern or practice of discrimination against African Americans, Hispanics and women in the fire and police departments (see United States v City of Buffalo, 457 F Supp 612 [WD NY 1978]).  The District Court issued a "Remedial Decree" designed to remedy the effects of past discrimination, which imposed interim hiring ratios and affirmative recruitment efforts to increase the percentages of underrepresented classes. The Decree was, for the most part, affirmed by the Second Circuit (633 F2d 643 [2d Cir 1980]).

In 1998, Men of Color Helping All (MOCHA), a not-for-profit organization of African American firefighters, brought a putative class action against the City of Buffalo in the Western District of New York, alleging racially discriminatory practices by the Buffalo Fire Department in violation of Title VII of the Civil Rights Act of 1964 (42 USC § 2000 et seq.) and the New York Human Rights Law (MOCHA I).  Among other things, the plaintiffs

claimed that the 1998 examination used to select firefighters for promotion had an illegal disparate impact against African American firefighters. MOCHA filed a second putative class action in 2003. This second suit alleged that the 2002 administration of the exam had the same discriminatory disparate impact as the 1998 exam (MOCHA II). About two years after the MOCHA II commencement, the City's then Human Resources Commissioner, Leonard Matarese, decided to allow the promotion eligibility lists to expire between September 2005 and February 2006, before the four-year maximum duration had elapsed.

Thereafter, while MOCHA I & II were still pending, this action was commenced. The 12 white firefighter plaintiffs on this appeal alleged that the City engaged in reverse, disparate treatment racial discrimination by permitting the promotion eligibility lists to expire before their maximum legal duration, thereby violating the Human Rights Law, the Civil Service Law, and the New York State Constitution.[1] Plaintiffs allege that had the lists been extended to their maximum duration of four years, in accordance with historical practice, they would have received promotions.

Prior to answering, the City moved to dismiss the

---

[1] There were originally 13 plaintiffs in this case; the trial court dismissed the claims of one plaintiff, Anthony Hynes, on February 8, 2012, finding that the City's actions had not harmed him. He did not appeal; thus, this appeal involves 12 plaintiffs.

complaint pursuant to CPLR 3211, raising, among other grounds, plaintiffs' undisputed failure to file a General Municipal Law § 50-i notice of claim.  The City argued that the statutory provision required the plaintiffs, as a precondition to commencing suit, to provide prior notice of their claims in order to permit timely investigation and opportunity for early resolution.  Plaintiffs cross-moved for partial summary judgment on liability.  Supreme Court denied the City's motion to dismiss and granted plaintiffs' motion for summary judgment on liability.  The litigation was then stayed pending resolution of the MOCHA I litigation.

The federal District Court then issued an order dismissing the Title VII claims to the extent the MOCHA plaintiffs sought relief based on the City's 1998 administration of the exam  (MOCHA Socy., Inc. v City of Buffalo, 2009 WL 604898 [WD NY March 9, 2009]).  A year later, the District Court dismissed the MOCHA II litigation as well, finding that the MOCHA plaintiffs were collaterally estopped from challenging the 2002 administration of the exam because there was a "substantial identity of dispositive issues and proof regarding the validity of the Lieutenant's Exams litigated in MOCHA I and MOCHA II" (MOCHA Socy., Inc. v City of Buffalo, 2010 WL 1930654 [WD NY May 12, 2010]).

In the present action, the Appellate Division, in June 2009, affirmed Supreme Court's denial of the City's motion to

dismiss, holding that dismissal was not warranted based on plaintiffs' failure to file a notice of claim under the General Municipal Law (63 AD3d 1574).  The court further concluded that plaintiffs were not entitled to summary judgment because they had failed to establish as a matter of law that the City's actions were not narrowly tailored to meet a compelling interest.

Three weeks later, the United States Supreme Court issued its decision in Ricci v DeStefano (557 US 557 [2009]).  In ruling for the petitioners, the Court concluded that an employer could not act based on mere statistical disparity alone - "[w]ithout some other justification, . . . race-based decision making violates Title VII's command that an employer cannot take adverse employment actions because of an individual's race" (id. at 579).  The Court held that "before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action" (id. at 585).

At the direction of the Appellate Division, both sides renewed their arguments at the Supreme Court and cross-moved for summary judgment.  Supreme Court granted plaintiffs' motion for summary judgment on the issue of liability.  The court concluded that the City had failed to meet the strong basis in evidence standard set forth in Ricci.  The Appellate Division affirmed

stating:

> "We agree with the court that the City defendants did not have a strong basis in evidence to believe that they would be subject to disparate-impact liability if they failed to take race-conscious actions, *i.e.*, allowing eligibility lists to expire, inasmuch as the examinations in question were job-related and consistent with business necessity"

(Margerum v City of Buffalo, 83 AD3d 1575, 1576 [4th Dept 2011]).

With liability established, the trial court proceeded with a bench trial on damages culminating in a judgment awarding plaintiffs $2,610,170 in economic damages and $255,000 in emotional distress damages.  The Appellate Division reduced the economic damages, yielding a final judgment of $1,621,007.  This Court granted leave to appeal to both plaintiffs and the City.

Preliminarily, we reject the City's argument for dismissal on the basis of plaintiffs' failure to file a notice of claim prior to commencement of this action.  General Municipal Law § 50-e (1) (a) requires service of a notice of claim within 90 days after the claim arises "[i]n any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action or special proceeding against a public corporation." General Municipal Law § 50-i (1) precludes commencement of an action against a city "for personal injury, wrongful death or damage to real or personal property alleged to have been sustained by reason of the negligence or wrongful act of such city," unless a notice of claim has been

served in compliance with section 50-e.  The Appellate Division departments addressing the issue have determined that the General Municipal Law does not encompass a cause of action based on the Human Rights Law and "[s]ervice of a notice of claim is therefore not a condition precedent to commencement of an action based on the Human Rights Law in a jurisdiction where General Municipal Law  §§ 50-e and 50-i provide the only notice of claim criteria" (Picciano v Nassau Cty. Civ. Serv. Commn., 290 AD2d 164, 170 [2d Dept 2001]; see Sebastian v New York City Health & Hosps. Corp., 221 AD2d 294, 294 [1st Dept 1995]; Palmer v City of New York, 215 AD2d 336, 336 [1st Dept 1995]).  Human rights claims are not tort actions under 50-e and are not personal injury, wrongful death, or damage to personal property claims under 50-i.  Nor do we perceive any reason to encumber the filing of discrimination claims.  Accordingly, we conclude that there is no notice of claim requirement here.

        As to liability, we do not believe that this is an issue that should have been decided at the summary judgment stage.  In Ricci v DeStefano, the United States Supreme Court held that before taking race-based action, "the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action" (557 US at 585) (emphasis added).  As both parties agree, the Ricci standard governs.  We have consistently held that the standards for recovery under the

New York Human Rights Law are in nearly all instances identical to Title VII and other federal law (see, e.g. <u>Forrest v Jewish Guild for the Blind</u>, 3 NY3d 295, 305 n. 3 [2004]; <u>Rainer N. Mittl, Ophthalmologist, P.C. v New York State Div. of Human Rights</u>, 100 NY2d 326, 330 [2003]).

In <u>United States v Brennan</u> (650 F3d 65 [2d Cir 2011]), the Second Circuit cautioned against allowing a defendant to rely on after-acquired evidence to buttress a race-based decision, noting that the <u>Ricci</u> Court "considered only what the city knew at the time it made its decision," and explaining:

> "The rationale underlying <u>Ricci</u>, moreover, confirms that the evidence is to be gauged at the time of the race - or sex-conscious employer action. The strong-basis-in-evidence standard is intended to 'strike a balance' between the Title VII provisions concerning disparate treatment and disparate impact, so that employers make the right decisions in the first place"

(<u>id.</u> at 111).

In this case, the issue of liability turns on the factual circumstances behind the City's actions, the strength of its justifications and its motivations. It is undisputed that the plaintiffs here made out a prima facie case of discrimination, as the City chose not to promote white candidates from the eligibility list. The burden then shifted to the City to prove that it had "a strong basis in evidence to justify its race conscious action" (see <u>Christopher v Adam's Mark Hotels</u>, 137 F3d 1069, 1071 [8th Cir 1998] ["We proceed with caution when

deciding whether summary judgment is appropriate in employment discrimination cases because intent is usually a central issue"]; and see St. Mary's Honor Ctr. v Hicks, 509 US 502, 507-508 [1993]; McDonnell Douglas Corp. v Green, 411 US 792, 802 [1973]; Forrest, 3 NY3d at 328 ["Whether or not these changes occurred as a result of the grievances filed by appellant would arguably be a question of fact for the jury.  Further, whether or not appellant was terminated as a result of her grievances and for filing a complaint in September 1994 with the EEOC and New York City Human Rights Commission would also arguably be questions for the jury"]).

Given the nature of the matter, the City's litigation posture in the MOCHA court cannot be taken at face value.  There must be a credibility assessment of the City's position as to the validity of the examinations, the prospects in the federal litigation, and the reasons for its decision to expire the promotion eligibility lists.  We know that Matarese decided to let the promotion eligibility lists expire in 2005 and 2006. What we do not know is why.  There are differences between Matarese's testimony from 2006 and his testimony from 2010.  The October 25, 2006 testimony, given while the MOCHA litigation was pending, is vague, and mostly focuses on his desire to undo the racial imbalance in the fire department.  Matarese's affidavit, dated January 20, 2010, explicitly cites the advice of the City's expert, Dr. Nancy Abrams - that there was a substantial risk that

the MOCHA plaintiffs would prevail in federal court - as the City's reason for allowing the lists to expire.  In light of <u>Brennan</u> (650 F3d at 111), the facts thus far ascertained are insufficient to determine what the City's intentions were at the time that the lists were expired.

Based on the record before us, we conclude that whether the City had "a strong basis in evidence to believe it [would] be subject to disparate-impact liability" at the time that it terminated the promotion eligibility lists while the MOCHA litigation was still pending raises issues of fact that cannot be determined on motions for summary judgment.

Accordingly, the order of the Appellate Division should be modified, without costs, by remitting to Supreme Court for further proceedings in accordance with this opinion, and, as so modified, affirmed.

READ, J. (CONCURRING):

The threshold question on this appeal is whether a timely notice of claim was a condition precedent to plaintiffs' lawsuit alleging that the City of Buffalo violated the Human Rights Law.  I agree with my colleagues that sections 50-e and 50-i of the General Municipal Law are more naturally read to exclude plaintiffs' claims from the notice-of-claim requirements generally applicable to suits against governmental entities.  I

write separately simply to highlight an inconsistency in New York law, which the Legislature might choose to address.

We have held that an employment discrimination claim brought against a <u>county</u> under the Human Rights Law is subject to County Law § 52 (1)'s notice-of-claim requirement (<u>Mills v County of Monroe</u>, 89 AD2d 776 [4th Dept 1982], <u>affd</u> 59 NY2d 307, 309 [1982], <u>cert denied</u> 464 US 1018 [1983], <u>overruled in part on other grounds by Felder v Casey</u>, 487 US 131 [1988]; <u>see also Matter of Freudenthal v County of Nassau</u>, 99 NY2d 285, 292-293 [2003]).  Section 52 (1) is worded similarly, but not identically, to section 50-i.

In <u>Mills</u>, we observed that "the State's notice requirements are [not] antithetical to the policy underlying the civil rights laws . . . [N]otice of claim requirements in this State serve an important State interest.  Requiring notice allows a governmental subdivision a meaningful opportunity to investigate in a timely manner the circumstances that gave rise to a claim" (<u>id.</u> at 310).  There are certainly reasons why the Legislature might nonetheless choose to treat civil rights actions differently, as this opinion suggests; however, it is hard to believe that the Legislature ever intended to create a situation where an action brought against the County of Erie alleging violations of the Human Rights Law would require a notice of claim as a condition precedent to suit, while the same type of action brought against the City of Buffalo would not.

Margerum v City of Buffalo

No. 7

RIVERA, J.(concurring in part and dissenting in part):

I agree, albeit for different reasons, that plaintiffs are not entitled to summary judgment on the issue of liability under the New York State Human Rights Law ("Human Rights Law"). In my opinion, an employer's rejection of employment criteria in order to avoid disparate impact does not constitute statutorily proscribed intentional discrimination. As a consequence, the plaintiffs' disparate treatment claims are without merit and should be dismissed, and the case remitted for consideration of the plaintiffs' remaining claims. Moreover, I disagree with the majority that the "strong basis in evidence" standard set forth in Ricci v DeStefano (557 US 557 [2009]) applies to the parties' dispute. That standard undermines the legislative purpose and stated equal opportunity goals of our Human Rights Law and we should reject it outright. I write separately to explain what I consider to be the proper approach to plaintiffs' Human Rights Law claims.[1]

New York State is a pioneer in addressing discrimination at the workplace. In 1945, two decades before the

---

[1] Plaintiffs' challenges under the state constitution are not at issue in this appeal and I express no opinion on the merits of those claims.

- 1 -

effective date of Title VII, New York enacted the Ives-Quinn
Anti-Discrimination Law, prohibiting discrimination on the basis
of race, creed, color or national origin (L 1945, ch 118).  After
its enactment as the first state statute to ban employment
discrimination in the private sector, the law was renamed in 1968
to the New York State Human Rights Law (L 1968, ch 958; see also
Susan D. Carle, How Myth-Busting About the Historical Goals of
Civil Rights Activism Can Illuminate Future Paths, 7 Stan J Civ
Rts & Civ Liberties 167, 173 [2011]).  Over time the legislature
expanded the law's coverage to provide maximum protection to New
Yorkers, by prohibiting discrimination on the basis of age,
sexual orientation, military status, sex, disability,
predisposing genetic characteristics, marital status, and
domestic violence victim status[2] (L 1975, ch 803; L 2002, ch 2; L
2003, ch 106; L 2010 ch 196).

The legislature intended for the Human Rights Law to
protect "the public welfare, health and peace of the people" of
the state of New York, "in fulfillment of the provisions of the
constitution of this state concerning civil rights[]" (Executive

---

[2] Under Human Rights Law § 296, it is an unlawful
discriminatory practice "[f]or an employer or licensing agency,
because of an  individual's age, race, creed, color, national
origin, sexual orientation, military status, sex, disability,
predisposing genetic characteristics, marital status, or domestic
violence victim status, to refuse to hire or employ or to bar or
to discharge from employment such individual or to discriminate
against such individual in the compensation or in terms,
conditions or privileges of employment" (Executive Law § 296 [1]
[a]).

Law § 290 [2]).  As part of the legislative findings and

statutory purpose, the Human Rights Law declares

> "the state has the responsibility to act to assure,
> *inter alia*, that every individual within this state is
> afforded an equal opportunity to enjoy a full and
> productive life and the failure to provide such equal
> opportunity,. . . not only threatens the rights and
> proper privileges of its inhabitants but menaces the
> institutions and foundation of a free democratic state
> and threatens the peace, order, health, safety and
> general welfare of the state and its inhabitants"

(Executive Law § 290 [3]; see also State Div. of Human Rights v

Kilian Mfg. Corp., 35 NY2d 201, 207 [1974]).

From its original enactment, the legislature adopted

the lexicon of "rights-based guarantees" and declared "[t]he

opportunity to obtain employment without discrimination. . . to

be a civil right"[3] (Executive Law § 291 [1]).  Since 1945, the

legislature has amended the civil rights provision of the Human

Rights Law several times, and on each occasion extended the

provision's anti-discrimination protections (see L 1975, ch 803

[extending the prohibition against discrimination to include

discrimination on the basis of age or marital status], and L

2002, ch 2 [extending the prohibition against discrimination to

---

[3] The civil rights provision of the Human Rights Law also
recognizes as a civil right "[t]he opportunity to obtain
education, the use of places of public accommodation and the
ownership use and occupancy of housing accommodation and
commercial space" (Executive Law § 291 [2]).  It further declares
that "t]he opportunity to obtain medical treatment of an infant
prematurely born alive in the course of an abortion shall be the
same as the rights of an infant born spontaneously" (Executive
Law § 291 [3]).

include discrimination on the basis of sexual orientation], and L

2003, ch 106 [extending the prohibition against discrimination to

include discrimination on the basis of military status], and L

2010 ch 196 [extending the prohibition against discrimination to

include discrimination on the basis of disability]).

Further amendments to the Human Rights Law have

expanded rather than contracted its scope, another indicator of

the legislative intent to ensure broad coverage of the

protections generally afforded under the statute (see e.g.

Executive Law § 296 [1] [a], as amended by L 1975, ch 803 [adding

prohibition against employment discrimination on the basis of

marital status]; Executive Law § 292 [21], as amended by L 1979,

ch 594 [expanding scope of Human Rights Law protection by

broadening range of disabilities within coverage]; Executive Law

§ 298-a, as amended by L 1975, ch 662 [amending the Human Rights

Law to reach acts of discrimination occurring outside the

state]).

Undeniably, the statute is an expression of New York

State's commitment to equality within society, based on

antidiscrimination principles.  It reflects, what this Court has

recognized is the "State's strong and important public policy

against discrimination" (New York Inst. of Tech. v State Div. of

Human Rights, 40 NY2d 316, 324-325 [1976]).

The Court has broadly interpreted the Human Rights Law

consistent with the statutory mandate that "[t]he provisions of

the [Human Rights Law] shall be construed liberally for the accomplishment of [its] purposes" (Executive Law § 300; see e.g. Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 183 [1978] [liberal construction of Human Rights Law guided determination of whether substantial evidence supported decision of New York Human Rights Division]; City of Schenectady v State Div. of Human Rights, 37 NY2d 421, 428 [1975] [relying on liberal construction of the Human Rights Law to reject argument that City and Police Department should not be liable where independent board they created discriminated on the basis of sex]; New York Inst. of Tech., 40 NY2d at 324-325 [liberal construction supported granting Human Rights Division power to grant professor tenure]).  Indeed, it is "the duty of the courts to make sure that the Human Rights Law works and that the intent of the legislature is not thwarted by a combination of strict construction of the statute and a battle with semantics" (City of Schenectady, 37 NY2d at 428).  To that end, the Court has held that "an employment practice neutral on its face and in terms of intent which has a disparate impact upon a protected class of persons violates the Human Rights Law unless the employer can show justification for the practice in terms of employee performance" (People v NYC Transit Authority, 59 NY2d 343, 348-349 [1983], citing Matter of Sontag v Bronstein 33 NY2d 197, 201 [1973]; City of Schenectady, 37 NY2d at 429, citing New York State Div. of Human Rights v New York-Pennsylvania Professional

Baseball League, 36 AD2d 364, 367 [4th Dept 1971]).

As a precursor to the 1964 Civil Rights Act, the Human Rights Law is not modeled on Title VII, and has certain significant distinctions that extend its coverage beyond that of Title VII. For example, the Human Rights Law prohibits employment discrimination on additional grounds of sexual orientation, predisposing genetic characteristics, marital status, domestic violence victim status, and arrest or criminal accusation record (compare Executive Law § 296 [1] [a], [16] with 42 USC § 2000e-2). In addition, the Human Rights Law applies to more employers than does Title VII. The Human Rights Law covers employers with at least four employees, while Title VII is limited to employers with at least fifteen employees (compare Executive Law § 292 [5] with 42 USC § 2000e [b]). However, Title VII affords greater financial relief than the Human Rights Law by providing for punitive damages and attorney's fees (42 USC § 1981a [b] [1] [providing for punitive damages]; 42 USC § 2000e-5 [k] [providing for attorney's fees]).

Nevertheless, the Human Rights Law and Title VII are generally consistent, with similar language and goals. Indeed, the Court has recognized that "the standards for recovery under [the Human Rights Law] are in accord with Federal standards under title VII" (Ferrante v American Lung Assn., 90 NY2d 623, 629 [1997]). The Court has concluded that "[b]ecause both the Human Rights Law and Title VII address the same type of discrimination,

afford victims similar forms of redress, are textually similar
and ultimately employ the same standards of recovery, federal
case law in this area proves helpful" (Forrest v Jewish Guild for
the Blind, 3 NY3d 195, 305 n 3 [2004], citing Matter of
Aurecchione v New York State Div. of Human Rights, 98 NY2d 21, 26
[2002]).

Here, however we are not presented with a federal
standard recognized previously by our courts as "in accord" with
the Human Rights Law (Ferrante, 90 NY2d at 629).  Rather, the
question in this appeal is what standard applies to the
plaintiffs' state law claims.  Relying on the Court's prior
application of federal law, but without significant analysis of
the propriety of doing so in this case, the majority agrees with
the courts below that the "strong basis in evidence" standard
applicable under Title VII as announced in Ricci should also
apply to the plaintiffs' Human Rights Law claims (Maj Op at 7-8).
However, before adopting this standard we must carefully
scrutinize the text and intended purpose of the Human Rights Law
to ensure that the federal approach under Title VII is best
suited to further our State's law and policy.

In the past, the Court has "attempted to resolve
federal and state employment discrimination claims consistently"
(Ferrante, 90 NY2d at 629).  In light of the federal and state
statutory alignment and our Court's past treatment of federal
law, any departure from federal analysis requires close

consideration.  Our rejection of the federal approach should be limited to those rare cases where federal interpretations of Title VII are at odds with, or undermine, the text or legislative goals of the Human Rights Law.  For example, where the federal standard contracts rather than expands the application of the statute, or places the well-established legislative goal of equal opportunity in jeopardy, federal case law provides little guidance.  Moreover, if the federal standard is a significant break from our prior approach we must consider if avoidance of the federal analysis is warranted as a matter of state law.

In my opinion, the instant appeal presents the rare case where we must reject the federal "strong basis in evidence" standard because it is in contravention of the legislative intent and goals of the Human Rights Law to ensure equal opportunity at the workplace.  The federal approach essentially subordinates the interests of plaintiffs alleging disparate impact to those of plaintiffs claiming disparate treatment.  According to the majority and dissent in Ricci, the standard conceives of a contest between individual claims of intentional discrimination, i.e. disparate treatment claims, and efforts to avoid liability for employment practices with disparate effects, i.e. disparate impact claims (see Ricci 557 US at 580-82 [Kennedy, J.]).  As the dissent in Ricci argues, this is an incorrect view of Title VII and federal case law (Ricci, 557 US at 624 [Ginsburg, J., dissenting] ["Neither Congress' enactments nor this Court's Title

VII precedents. . . offer even a hint of 'conflict' between an employer's obligations under the statute's disparate-treatment and disparate impact provisions"]).  I too find that there is no contest between these two branches of discrimination theory, and therefore would find that the standard has no place in our interpretation of the Human Rights Law.

Antidiscrimination law posits just the opposite of the standard as conceived in Ricci, because Ricci treats the choice to reject criteria that has discriminatory results as an exercise in wrongful discrimination, while antidiscrimination law focuses on a society free of the mechanisms and tools which would result in disparate outcomes.  Antidiscrimination laws and statutes aimed at achieving equal opportunity in employment, like the Human Rights Law, are based on the foundational principle that a workplace conceived and established in accordance with practices that result in disparate effects is harmful and unlawful.  Hence, claims that rely on the reenforcement of employment criteria that results in a disparate impact are devoid of a sound legal or public policy grounding.

Under the Human Rights Law, no individual has a stake in a workforce selected and maintained through the use of criteria that result in proscribed disparities.  A workforce so constituted is antithetical to the statute's concept of equal opportunity, and the right to employment purged of discrimination (Executive Law § 296).  Moreover, a workplace structured to

further inequality violates the Human Rights Law because it
"threatens the rights and proper privileges of [New York State's]
inhabitants [and] menaces the institutions and foundation of a
free democratic state and threatens the peace, order, health,
safety and general welfare of the state and its inhabitants"
(Executive Law § 290 [3]).  Since an employer does not commit
statutorily proscribed intentional discrimination when the
employer seeks to reduce and eliminate the causes of inequality
at the workplace, the Ricci standard cannot guide our resolution
of the issues presented in this appeal.

Another reason why we should reject the federal
approach is because it discourages an employer's voluntary
compliance out of fear the employer will be unable to establish
"the strong basis in evidence" necessary to avoid liability for
disparate treatment claims.  By requiring more than prima facie
evidence of disparate impact established by statistical
disparities at the workplace, the standard imposes a heavy burden
on employers, which ultimately leads to employer inaction.
Obviously, the costs of litigation and the impact on municipal
functions puts significant pressure on a municipal employer to
avoid litigation.  As amici argue in support of the City,
"[p]rotracted employment litigation [] has a highly disruptive
effect on the provision of vital public services that goes well
beyond the havoc wrecked on the public fisc" (Brief for
International Municipal Lawyers Association as Amicus Curiae at

20).  Thus, the federal approach incentivizes employers to
maintain the status quo, and retain employment criteria
regardless of the disparate effects, in contravention of the
Human Rights Law's goals of ensuring "that every individual
within this state is afforded an equal opportunity to enjoy a
full and productive life" (Executive Law § 290 [3]), and
discrimination-free employment (Executive Law § 291 [1]).  Rather
than encourage employers to adopt tests and employment practices
which ensure equal access to jobs, the federal standard does just
the opposite.

        The appeal before us is an example of why the federal
standard is ill-suited to ensure compliance with the Human Rights
Law.  As the majority points out, the City of Buffalo has
historically discriminated in employment for jobs within the fire
and police departments (Maj Op at 2-3).  The consequences of its
actions were so severe and obvious that the United States
government sued to bring it in line with federal
antidiscrimination laws.  The remedial order enjoined the City

> "from. . . engaging in any practice with respect to
> hiring, assignment, promotion, transfer, or
> compensation which has the purpose or effect of
> discriminating against any employee with. . . the
> Buffalo Fire Department because of such individual's
> race, sex, or national origin, nor will they engage in
> any acts or practices which deny to [Blacks, Hispanics]
> or women  equal employment opportunity"

(Final Decree and Order of November 23, 1979, at ¶ 1).

        When the City applied tests which resulted in racial
and ethnic disparities in promotional practices, it was sued by

MOCHA.  In the course of defending these practices and tests, the City was presented with opinions from its own expert and the plaintiff's expert that the method used to validate the examinations was flawed.  The City's expert concluded that "the scientific evidence supporting the validity of [the examination] was limited" and "it might not be in the City's best interest to call [her] to testify."  She further concluded that there was a substantial risk that the MOCHA plaintiffs would prevail. Faced with a choice to continue using a promotion tool criticized as flawed, or abandoning a test whose methodology was contested even by the City's own expert, the Commissioner chose to forego any further use of the eligibility list created based on the invalid examination.

The Commissioner's actions were in full compliance with the Human Rights Law and disparate impact theory as adopted by this Court (see Executive Law § 296; NYC Transit Authority, 59 NY2d at 348-349 [1983]; City of Schenectady, 37 NY2d at 429; Bronstein, 33 NY2d at 201).  Yet, under the federal standard, the City would be liable for employment discrimination if it fails to establish "a strong basis in evidence that, had it not taken the action, it would have been liable" for disparate impact discrimination under Title VII (Ricci, 557 US at 563).  This is a real possibility given the majority concludes that, despite the existence of expert evidence of actionable disparate impact, the City may be unable to establish the Commissioner's motives were

nondiscriminatory in nature.  Thus, even though the City did not incur liability in the MOCHA federal action, it is unclear whether it will prevail in this case.[4]

As a last point, I note that the federal standard has the potential to create an untenable situation for employers sued by different parties, under different theories, seeking conflicting outcomes.  An employer could find itself taking positions in litigation which appear contradictory, to its detriment.  For example, here, the City defended the use of the eligibility examinations in the federal lawsuit, even after it had evidence from its own expert that the examination was flawed.  Nevertheless, the City argued in the instant case, in reliance on that very same expert evidence, that the Commissioner allowed the eligibility lists to expire because he believed the tests were invalid. The plaintiffs in the state action understandably sought to exploit these facially divergent positions, and challenged the Commissioner's credibility based on the content of his statements in the two lawsuits.  Indeed, the majority accepts that the differences in the Commissioner's testimony in 2006 from that provided in 2010, raises a question as to his motives.

Aside from whether as a legal matter the City's positions in the two lawsuits can be justified and harmonized, it

---

[4] The federal district court concluded that the City established that the 1998 examination was "job-related. . . and consistent with business necessity" (M.O.C.H.A. Socy., Inc. v City of Buffalo ["M.O.C.H.A. I"], No. 98-cv-99C, 2009 WL 604898 [WDNY Mar. 9, 2009], affd 689 F3d 263 [2d Cir 2012]).

is difficult to see how adoption of a standard that creates such potential conflict is within the spirit of the Human Rights Law. It seems a disservice to the goal of equal opportunity to expend municipal and judicial resources in litigation that apparently lacks legal merit.

The Court has historically considered federal case law in deciding questions regarding the proper interpretation and application of the Human Rights Law.  We should continue to do so in the future, except in the rarest of cases where the federal approach undermines the clearly stated and well-established purpose and goals of the Human Rights Law.  I believe the federal standard adopted by the majority is not in accord with the antidiscrimination equality principles upon which the Human Rights Law is based, and, in contravention of the law, encourages employers to retain invalid, discriminatory employment criteria.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order modified, without costs, by remitting to Supreme Court, Erie County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.  Opinion by Chief Judge Lippman.  Judges Read, Pigott and Abdus-Salaam concur, Judge Read in a separate concurring opinion.  Judge Rivera concurs in part and dissents in part in an opinion.  Judges Stein and Fahey took no part.

Decided February 17, 2015