# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-2947

_____

RSA 1 Limited Partnership; Iowa RSA 2 Limited Partnership

*Plaintiffs - Appellants*

v.

Paramount Software Associates, Inc., doing business as Professional Software of Amarillo

*Defendant - Appellee*

_____

No. 14-3382

_____

RSA 1 Limited Partnership; Iowa RSA 2 Limited Partnership

*Plaintiffs - Appellants*

v.

Paramount Software Associates, Inc., doing business as Professional Software of Amarillo

*Defendant - Appellee*

_____

Appeals from United States District Court
for the Southern District of Iowa - Council Bluffs

_____

Submitted: April 14, 2015
Filed: July 17, 2015
_____

Before WOLLMAN and GRUENDER, Circuit Judges, and DOTY,[1] District Judge.

_____

GRUENDER, Circuit Judge.

In this breach-of-contract case, two cellular-service providers dispute whether they owe approximately $260,000 in liquidated damages to a billing-services company. The district court[2] granted summary judgment to the billing company, Paramount Software Associates. We affirm.

## I.    Background

In March 2009, Paramount, a Texas company, contracted with two Iowa cellular-service providers, RSA 1 Limited Partnership and Iowa RSA 2 Limited Partnership (together, the "RSAs"). The parties agreed that Paramount would provide billing services by processing RSA customer information and that the RSAs would pay Paramount $1.05 per month for each RSA customer whose information Paramount processed.

Several aspects of the contract are particularly important. First, there is the $1.05 rate itself. Paramount set this rate to help achieve its target profit margin for

_____

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota, sitting by designation.

[2]The Honorable John A. Jarvey, now Chief Judge, United States District Court for the Southern District of Iowa.

its entire business, a small overall margin. Next, there is Section 1 of the contract, which provided for an initial three-year term, followed by continual renewal for two-year terms, unless a party gave six months' notice. Next, Section 12 provided for early termination and liquidated damages. As relevant here, the RSAs could end the agreement before the end of a term, but if they did, they would have to pay Paramount "all projected monthly fees based on the number of unexpired months remaining on" the term. Paramount intended the prospect of these liquidated damages to dissuade the RSAs from terminating the contract early. Finally, there is what the contract did not include: the contract did not guarantee Paramount a minimum number of RSA customer records to process, nor did it require the RSAs to use Paramount exclusively.[3]

---

[3] The RSAs signed materially identical contracts with Paramount. The relevant sections read:

**1.0 Term**
Subject to the provisions of Section 12 hereof, the initial term shall be thirty six (36) months. This Agreement shall automatically renew for successive twenty four (24) month terms unless either party notifies the other of intent not to renew within six (6) months before the end of any term.

. . . .

**12.0 Termination**
The early termination fee is the parties' reasonable pre-estimate of Servicer's probable loss from such early termination and represents a reasonable endeavor by Servicer to estimate foreseeable losses that might result from such early termination and provides for the payment of such amounts as liquidated damages in the event of such early termination. . . .

> **12.1 Termination for Non-Payment -** In the event Servicer is not in default under this Agreement and Customer fails to pay any

For a time, Paramount served the RSAs, spending "a significant amount of time" on them each month. But in late 2011, the RSAs sent Paramount a letter explaining that the RSAs were switching billing companies. The letter explained that the RSAs would "be asking for [Paramount's] assistance . . . to make the conversion successful." The RSAs would "send an official notice to [Paramount] when [they] want[ed] the system shut down." They concluded by thanking everyone "who worked on [their] account over the past years" and wishing Paramount "much success in the future."

---

fees properly invoiced to Customer by Servicer within thirty (30) days after Customer's receipt of Servicer's invoice therefore [sic] Servicer, in its discretion, after providing ten (10) days notice in writing to Customer to cure, may terminate this Agreement upon notice to Customer.

**12.2 Termination on Notice -** At any time after twelve (12) months from the date of this Agreement, Customer may terminate this Agreement upon ninety (90) days prior written notice to Servicer.

**12.3 Termination Fee -** In the event either Servicer or Customer terminates this Agreement pursuant to Section 12.1 or Section 12.2, Customer shall pay to Servicer an early termination fee. The early termination fee will be the greater amount of the following two methods of calculation.

A. Equal to the fees paid or accrued by Customer during the six (6) month period prior to the giving of notice.

B. The total of all projected monthly fees based on the number of unexpired months remaining on the current Agreement.

-4-

Over the next year or so, Paramount continued to serve the RSAs while helping them transfer to their new billing company. Before the transfer was finished, the initial, three-year term of the contract ended, and the contract renewed for a two-year term. Finally, in January 2013, the RSAs stopped using Paramount entirely, with over a year remaining on the renewed term.

From its reading of Section 12, Paramount believed that the RSAs had terminated the contract early and, accordingly, that they owed liquidated damages. The RSAs contended they did not. The RSAs sought a declaratory judgment, Paramount counterclaimed for breach of contract, both sides moved for summary judgment, and the district court granted summary judgment to Paramount. The RSAs now appeal, challenging various rulings on termination, interpretation, enforceability, and the calculation of damages.

## II.    Analysis

"[W]hen a party appeals both the denial of its motion for summary judgment and the grant of summary judgment in favor of the appellee, we may review both orders." *United Fire & Cas. Co. v. Titan Contractors Serv., Inc.*, 751 F.3d 880, 886 (8th Cir. 2014). We review *de novo*. *Id.* at 883. Summary judgment is proper when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). The movant must identify portions of the record that he "believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). After that, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). "[F]acts must be viewed in the light most favorable to the" nonmovant, but only "if there is a genuine dispute as to those facts." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). As the parties agree that Texas law

controls, we follow on-point precedent of the Supreme Court of Texas; where there is none, we predict how it would rule. *See Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856 (8th Cir. 2010); *Matrix Grp. Ltd., Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 589 (8th Cir. 2007).

### A.     The RSAs terminated the contract.

The RSAs argue that they never terminated the contract and thus that they cannot owe early termination fees. In their view, because the contract never promised Paramount exclusivity or a minimum number of customer records to process, the RSAs could stop using Paramount's services and start using another provider's, all without terminating the contract.

This argument fails precisely because it negates the contract's early-termination and liquidated-damages provisions. The Supreme Court of Texas reads all parts of a contract together, giving "meaning to every sentence, clause, and word to avoid rendering any portion inoperative." *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 740-41 (Tex. 1998). Here, Section 12.2 explained that "[a]t any time after twelve (12) months from the date of this Agreement, [the RSAs] may terminate this Agreement upon ninety (90) days prior written notice to [Paramount]." If the RSAs had no obligation to use Paramount's services, this clause had no purpose: the RSAs never would have needed to terminate an agreement that did not obligate them to do anything. Similarly, Section 12.3 explained that if the RSAs did terminate the agreement under Section 12.2, they would owe Paramount liquidated damages. The RSAs' interpretation effectively renders this clause inoperative as well because the RSAs never would have owed damages for termination after notice—not when they simply could have stopped using Paramount instead. Thus, the contract as a whole shows that the RSAs did agree to use Paramount's services to some extent. So when they told Paramount they were switching billing companies, asked it to shut down its system, thanked its employees, and eventually stopped using Paramount

-6-

entirely, the RSAs terminated the agreement. *See Hughes v. Cole*, 585 S.W.2d 865, 866-67, 869 (Tex. Civ. App. 1979) (explaining that the contract there could "be terminated by either party by giving notice of or doing something sufficient to indicate to the other party an intention to do so").

## B.     Section 12 applied during the renewed term.

The RSAs also argue that the liquidated-damages provision applied only during the initial, three-year term, not during the renewed term when they stopped using Paramount. Specifically, Section 1 provided that "*Subject to the provisions of Section 12 hereof*, the initial term shall be thirty six (36) months." (emphasis added). The RSAs read the emphasized language to mean that Section 12's liquidated damages could arise only during the initial term. But this is plainly not what that language means. Again, Section 12 allowed for early termination. Thus, the initial, three-year term described in Section 1 might have been shorter had the contract terminated early. "Subject to the provisions of Section 12" meant only that. In the RSAs' alternative interpretation, all sections, except one, renew. The contract cannot bear this curious reading.

## C.     The liquidated-damages provision is enforceable.

Next, the RSAs challenge whether the liquidated-damages provision is enforceable. This is question of law. *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991). In Texas, a liquidated-damages provision is enforceable if "(1) 'the harm caused by the breach is incapable or difficult of estimation,' and (2) 'the amount of liquidated damages called for is a reasonable forecast of just compensation.'" *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 69 (Tex. 2014) (quoting *Phillips*, 820 S.W.2d at 788). Here Section 12.3(B) called for the RSAs to pay Paramount "[t]he total of all projected monthly fees based on the number of unexpired months remaining on the current Agreement"—or in other words, $1.05

-7-

each time an RSA customer's information would have been processed from January 2013, when the RSAs ended the contract, to March 2014, the last month of the renewed term.

The RSAs do not seriously dispute that the harm caused by early termination of the contract was difficult to estimate. Rather, in their primary argument, the RSAs claim that this provision cannot be a reasonable forecast of just compensation. Just compensation, of course, is what Paramount would have gained during the remainder of the term—its lost profit. *See Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952) ("The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained."); *Texaco, Inc. v. Phan*, 137 S.W.3d 763, 771-73 (Tex. App. 2004). But the liquidated-damages provision here awards lost revenues and does not account for any of Paramount's expenses that the RSAs' early termination might have avoided. This substitution of revenue for profit, the RSAs argue, necessarily means the provision does not reasonably forecast just compensation.

Though we agree that revenue-based liquidated damages may be unreasonable sometimes, we conclude that there is no genuine issue as to whether they are an unreasonable forecast of just compensation here. First, for certain businesses, lost revenue may well be the same as lost profit. If the performance of a contract incurs no incremental expense, then there is nothing to deduct from lost revenue to determine lost profit. This will not be the case with the usual manufacturer, the costs of which vary with goods produced. For a data-processing company, however, "zero" may well be a reasonable approximation of the expense of additional electronic processing.

Moreover, in *Henshaw v. Kroenecke*, 656 S.W.2d 416 (Tex. 1983), the Supreme Court of Texas enforced a liquidated-damages provision based on revenue rather than profit. Henshaw and Kroenecke had been business partners. *Id.* at 417.

-8-

They had agreed that if Kroenecke left the partnership, he would not compete with Henshaw for three years. *Id.* If he did, he would owe as liquidated damages "12 times the average monthly partnership billing"—not the average partnership *profit*—for "each client or prior client with whom [he did] business." *Id.* The court explained that the "amount of liquidated damages, one year's average billing, is not an unreasonable sum, but is based on a formula representing the parties estimation of the value of the business which would be taken" if Kroenecke competed. *Id.* at 419.

We hesitate to deem *Henshaw* binding outright. It is unclear whether the court considered the revenue-profit distinction, and if the court did, it did not explain its reasoning. *See also Urban TV Network Corp. v. Liquidity Solutions, L.P.*, 277 S.W.3d 917, 918, 919-20 (Tex. App. 2009) (approving liquidated damages based on revenue without considering the revenue-profit distinction). Moreover, as the RSAs note, Kroenecke could have owed one year's revenue for diverting up to three years' profits. In that case, the liquidated damages in *Henshaw* could underestimate actual damages. But here, because the liquidated damages were based on the number of months remaining on the term, the RSAs argue that they were guaranteed to overpay.[4]

Despite these differences, *Henshaw* is informative. We think it enough, together with the preceding discussion of incremental expenses, to conclude that the Supreme Court of Texas would not automatically invalidate a liquidated-damages provision based on lost revenue. This is not to say that Texas law would always

---

[4]This argument is not exactly correct. The number of RSA customers whose data Paramount processed could vary each month. As such, because the liquidated damages were based on projections of customer numbers, liquidated damages still could have been less than actual damages if Paramount, but for the termination, would have processed the information of sufficiently more customers than projected. However, we acknowledge that liquidated damages never would have been less than actual damages if Paramount's projections were always accurate.

approve such a provision either, but merely that the provision's validity will turn on the facts of the case. And here, the RSAs have not shown a genuine issue as to the validity of the liquidated-damages provision.

First, the RSAs have not raised a genuine issue as to whether Paramount's projected revenue was an unreasonable approximation of just compensation because Paramount avoided sufficient incremental expense. *See FPL Energy*, 426 S.W.3d at 69-70. Paramount claims its revenue and profit were equal, that in servicing the RSAs it incurred no incremental expense. And the RSAs cite only evidence showing that Paramount performed various tasks for the RSAs and that it had a small profit margin overall. We do not think this evidence raises a genuine issue as to whether Paramount would have incurred sufficient incremental expenses in serving the RSAs specifically. Every real business has tasks and margins. These quotidian business aspects, in themselves, could not convince a reasonable jury that Paramount's lost revenue from the RSAs unreasonably approximated just compensation.

The RSAs' second argument about liquidated damages fails as well. They claim that Paramount intended the liquidated-damages provision to be a penalty and thus that the provision was not a reasonable forecast of just compensation. Indeed, Paramount's president agreed that the purpose of the liquidated damages "was to incent people to not terminate before the end of the contract." It is not entirely clear whether Paramount's intent matters. "One line of cases . . . states that the intention of the parties governs and another line states that their intention is immaterial." *Stewart*, 245 S.W.2d at 486. With respect to results, however, "there appears but little disparity between" these lines of cases. *Id.* The ultimate question is whether "the amount of liquidated damages called for is a reasonable forecast of just compensation." *FPL Energy*, 426 S.W.3d at 69. Even if intent influences this question, it appears that Texas law focuses primarily on the reasonableness of the contract as written. *See id.* at 71-72 (noting that courts are not bound by the parties' labels and that there is no "broad power to retroactively invalidate liquidated damages

provisions that appear reasonable as written"); *Stewart*, 245 S.W.2d at 486-87 (citing the rule of the Restatement (First) of Contracts § 339 (1932), which is generally unconcerned with intent); *Eakin v. Scott*, 7 S.W. 777, 778-79 (Tex. 1888) (equating the reasonable-forecast prong with "an inspection of the entire instrument"). As just discussed, the RSAs have not raised a genuine issue as to whether the liquidated-damages provision as written amounted to an unreasonable forecast of just compensation. *Cf. Garden Ridge, L.P. v. Advance Intern., Inc.*, 403 S.W.3d 432, 441-42 (Tex. App. 2013) (concluding that liquidated damages were a penalty where contracting party intended them to be, party did not attempt to forecast actual damages, *and* forecast was unreasonable as written). Accordingly, summary judgment was proper on the enforceability of the liquidated-damages provision.

## D. The liquidated damages were not zero.

In their final argument, the RSAs claim that, after a proper calculation, the amount of liquidated damages they owe is $0.00. Essentially, they repeat their argument about termination: because they simply could have stopped using Paramount, the "total of all projected monthly fees" was zero. Besides misconstruing the word "projected," this argument fails for the same reason the earlier one did. There is no point to a liquidated-damages provision if those damages are always zero, and under Texas law, we avoid reading out a contract provision. *See Balandran*, 972 S.W.2d at 740-41. The RSAs do not otherwise challenge the calculation of the approximately $260,000 award.

## III. Conclusion

We affirm the denial of summary judgment to the RSAs and affirm the grant of summary judgment to Paramount.

_____